UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN THE MATTER OF THE REFERRAL OF GREGORY M. HAYNES TO THE STANDING COMMITTEE OF THE UNITED STATES DISTRICT COURT

_____/

No. C 10-4642 PJH

**ORDER GRANTING PETITIONER'S MOTION FOR SUMMARY JUDGMENT**

Petitioner Standing Committee on Professional Conduct for the United States District Court for the Northern District of California ("the Committee") seeks an order removing respondent Gregory M. Haynes from the bar of the Northern District of California. Now before the court is the Committee's motion for summary adjudication of disbarment. Because of the length of time this matter has been pending, and the fact that proceedings in other cases filed in this court are relevant to the court's ruling, the court has endeavored to provide a comprehensive account in the present order in the hope of easing the burden of any judge who may be called upon to review this decision.

Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby GRANTS the Committee's motion as follows.

**INTRODUCTION**

Respondent Gregory M. Haynes is an attorney admitted to practice in the United States District Court for the Northern District of California.  On February 18, 2010, Joanne Hoeper, then-Chief Trial Attorney for the Office of the City Attorney of San Francisco, wrote a letter to the Hon. Vaughn R. Walker, then-Chief Judge of the Northern District, and to the Office of the Chief Trial Counsel at the State Bar of California.

In the letter, Ms. Hoeper asserted that Mr. Haynes had committed violations of the Rules of Professional Conduct, which raised "substantial questions as to [his] honesty,

**United States District Court**
For the Northern District of California

1   trustworthiness or fitness as a lawyer in other respects" within the meaning of A.B.A. Model

2   Rule of Professional Conduct 8.3.  Ms. Hoeper cited to specific incidents that had occurred

3   in matters in which Mr. Haynes had represented clients in cases adverse to the City and

4   County of San Francisco.

5          Based on these allegations of unprofessional conduct, Judge Walker referred the

6   matter to the Committee, pursuant to Civil Local Rule 11-6(a).  In response to the referral,

7   the Committee undertook to investigate the circumstances set forth in Ms. Hoeper's letter,

8   pursuant to Civil Local Rule 11-7(c), and also gathered other information regarding Mr.

9   Haynes.  The Committee twice requested an interview with Mr. Haynes, but asserts that he

10  rejected each request.  In particular, on April 16, 2010, one of the members of the

11  Commitee received an e-mail from Mr. Haynes stating, "I am not interested in discussing

12  Ms. Heoper's [sic] letter.  It is frivolous.  If you wish to investigate the letter, talk to her.

13  Hopefully, you will find it worthless and not bother me. . . . If you find some misconduct,

14  then contact me."

15         Again, in July 2010, one of the members of the Committee contacted Mr. Haynes to

16  say that the Committee had spoken with persons who had knowledge of the matters set

17  forth in Ms. Hoeper's letter, and wanted to hear Mr. Haynes' perspective before

18  determining how to proceed.  Mr. Haynes' response was that he had not authorized the

19  Committee to speak to anyone about him, and that he questioned the "authority and

20  impartiality" of the Committee.  The Committee subsequently had a subpoena issued

21  seeking Mr. Haynes' presence to testify at a deposition, but he refused to provide a time or

22  place where the subpoena could be served on him.

23         On September 28, 2010, a quorum of the Committee voted unanimously to file a

24  petition for an order to show cause why Mr. Haynes should not be removed from the bar of

25  the Northern District.

26                                          **BACKGROUND**

27  A.     The Allegations of Unprofessional Conduct

28         The allegations of unprofessional conduct in the petition are based primarily on

United States District Court

For the Northern District of California

1   events that had occurred in connection with two cases previously pending before judges in

2   this district – Cotterill v. City and County of San Francisco, No. C-08-2295 JSW; and

3   Landry v. City and County of San Francisco, No. C-08-3791 SC.  In addition, the

4   Committee asserted that events in other cases were  relevant to the charge because they

5   indicated a pattern of misconduct.

6          1.      The Cotterill case

7          In 2008, Cheryl Cotterill retained Mr. Haynes to represent her in connection with

8   claims arising from her involuntary confinement for ten days at San Francisco General

9   Hospital in 2006.  On her behalf, Mr. Haynes filed a complaint alleging federal civil rights

10  and common law tort claims against a variety of defendants, including the City and County

11  of San Francisco ("the City"), the Mayor and Chief of Police of San Francisco, the Regents

12  of the University of California ("the Regents"), and various individuals employed at San

13  Francisco General Hospital.

14         Counsel for the Regents, R. Wesley Pratt, asserts that while he was attempting to

15  fulfill his meet-and-confer responsibilities prior to the initial case management conference,

16  Mr. Haynes refused to cooperate, and also responded to Mr. Pratt's e-mails with profanity

17  and unprofessional comments.  For example, Mr. Haynes wrote an e-mail to Mr. Pratt

18  accusing him of having "bitched repeatedly about receiving email," and telling Mr. Pratt to

19  "read your fucking email."  When Mr. Pratt responded in a professional manner, Mr.

20  Haynes replied, "Fuck you.  I got no respect for you because you are a lying bitch."

21         After Mr. Pratt reported this conduct and other uncivil behavior to the court, the Hon.

22  Jeffrey S. White issued an order to show cause why Mr. Haynes should not be sanctioned

23  for failure to meet and confer in good faith.  Mr. Haynes responded with a declaration

24  asserting that he had always met and conferred in good faith, and that many of Mr. Pratt's

25  allegations were false or incomplete.  At the hearing, Judge White admonished counsel

26  regarding appropriate conduct towards each other, but declined to impose sanctions at that

27  time.

28         The Regents and some of the City defendants were dismissed from the action on

**United States District Court**
For the Northern District of California

1   the pleadings.  The remaining City defendants filed a motion for summary judgment, for

2   which the court set a briefing and hearing schedule.  The parties submitted a stipulation

3   and proposed order to change the hearing date, which was signed by the court on August

4   27, 2009.  The briefing schedule remained the same.  However, Mr. Haynes failed to file

5   the opposition brief by the August 31, 2009 date set by the court.  Instead, he filed a

6   stipulation purporting to change the opposition due date to September 4, 2009, and the

7   reply date to September 18, 2009, and also purporting to allow the plaintiff to file a motion

8   for summary judgment on September 8, 2009.  Judge White did not sign the proposed

9   order.

10          As of September 21, 2009, Mr. Haynes still had not filed the opposition brief.  The

11   City defendants filed a notice of lack of opposition filed, and a request for entry of summary

12   judgment in their favor.  Still no opposition was filed.  On September 24, 2009, Judge White

13   issued an order to show cause why the action should not be dismissed for failure to

14   prosecute.  The order required a response by September 29, 2009.

15          Mr. Haynes filed a response on September 30, 2009, setting forth various reasons

16   that he believed justified his failure to file a timely opposition.  Primarily, Mr. Haynes

17   asserted that he had "made a miscalculation as to the amount of time" that would be

18   required, and that he had also been taking medication that made concentration difficult.

19   Also on September 30, 2009, Mr. Haynes filed an opposition to the motion.  He did not

20   inform Ms. Cotterill that he had missed the filing deadline, or that Judge White had issued

21   the order to show cause.

22          On October 20, 2009, the City defendants filed a case management conference

23   statement, noting that they had attempted to meet and confer with Mr. Haynes regarding

24   the preparation of a joint statement, but that Mr. Haynes had failed to respond.

25          Also on October 20, 2009, Judge White issued an order granting the City

26   defendants' motion for summary judgment.  In the order, Judge White stated that he found

27   Mr. Haynes' conduct throughout the prosecution of the case to have been "reprehensible."

28   He also noted that Mr. Haynes had been sanctioned for discovery abuses; that he had

4

United States District Court
For the Northern District of California

1   been repeatedly late in filing his submissions, including the opposition to the summary

2   judgment motion, which had been filed "inexcusably late," and only after an order to show

3   cause had been entered.  Further, he found that Mr. Haynes' conduct and submissions had

4   been "consistently dilatory, rambling, and legally deficient."  A final judgment was issued on

5   October 21, 2009.

6       Both the Regents and the City submitted bills of costs, and also filed motions for

7   attorneys' fees and costs, pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1927, seeking a

8   total of more than $400,000 against both Mr. Haynes and Ms. Cotterill.  Judge White

9   referred these motions to Magistrate Judge James Larsen for a report and

10  recommendation.  Mr. Haynes did not inform Ms. Cotterill that defendants had filed motions

11  for sanctions.

12      Nor did Mr. Haynes promptly inform Ms. Cotterill of the court's summary judgment

13  ruling.  According to Ms. Cotterill, she did not obtain that information from Mr. Haynes at all,

14  but rather while she was reviewing the docket on PACER.  She sent an e-mail to Mr.

15  Haynes on November 13, 2009, stating that she was "surprised" he had not contacted her

16  to discuss the ruling, and further emphatically stating that she "[did] not want to appeal the

17  case" and "[did] not want to pursue any other action other than to defend against the

18  motions for attorneys' fees and costs."

19      Mr. Haynes responded to Ms. Cotterill's e-mail that same day, stating that the

20  reason he had delayed in advising her of the summary judgment ruling was that he

21  "needed time to review the opinion and digest it."  He also stated that he understood that

22  she "[did] not want to appeal the matter;" but added that "since there are appealable issues

23  which you should prevail upon, by appealing you have the leveage [sic] to agree to dismiss

24  the appeal in exchange for the dismissal of the claim for costs and attonrey [sic] fees."

25      Four days later, on November 17, 2009, Mr. Haynes wrote Ms. Cotterill an e-mail

26  advising her that counsel for the City defendants had indicated that the City would be

27  willing to negotiate the issue of fees and costs, if they could obtain a waiver of appeal, and

28  suggesting that the Regents might also be willing to negotiate the fees and costs in return

United States District Court

For the Northern District of California

1   for a waiver of appeal.  He also noted that the last day to file a notice of appeal would be

2   November 19, 2009, and strongly urged Ms. Cotterill to file a notice of appeal so she could

3   preserve her rights with regard to negotiating the fees and costs.

4          The following day, November 18, 2009, Mr. Haynes sent another e-mail to Ms.

5   Cotterill, asking her to call him regarding the notice of appeal.  He stated, "The failure to file

6   a notice of appeal may cost you a substantial sum due to not being able to negociate [sic]

7   the cost and attorney fees, if any is awarded."  Ms. Cotterill responded that same day with a

8   one-sentence e-mail, "For the second time, I do not want to file an appeal."  On November

9   19, 2009, without authorization from Ms. Cotterill, Mr. Haynes filed a notice of appeal.  He

10  did not inform her that he had done so.

11         On November 25, 2009, Ms. Cotterill wrote Mr. Haynes, asking that he confirm that

12  he "did NOT file a notice of appeal[,]" and adding that in her view, "it would be a

13  misrepresentation to the court to file a notice when you know I do not want to appeal."  Two

14  days later, on November 29, 2009, Ms. Cotterill wrote Mr. Haynes to say, "I just discovered

15  that you did file a notice of appeal against my express wishes that you do not file an

16  appeal."  She requested that he "dismiss the appeal immediately."

17         On December 1, 2009, Mr. Haynes responded that he had filed the notice of appeal

18  "as the time to filed [sic] would have expired."  He stated that he would dismiss the appeal

19  as Mr. Cotterill had requested, but again urged her not to dismiss the appeal before she

20  had obtained an agreement from the defendants regarding the costs and fees.

21         On December 2, 2009, Ms. Cotterill responded that she understood the point Mr.

22  Haynes was trying to make, but stated that she simply did not agree.  She reiterated that

23  she did not want to appeal, and wanted him to "dismiss the appeal before the end of the

24  week despite the ramifications that [he] discuss[ed]."

25         On December 8, 2009, Ms. Cotterill sent Mr. Haynes a hand-written note, again

26  demanding that he dismiss the notice of appeal.  She stated that if the appeal was not

27  dismissed by December 11, 2009, she would discharge him as her attorney.  Nevertheless,

28  Ms. Cotterill asserts, Mr. Haynes did not dismiss the appeal.  Finally, Ms. Cotterill herself

United States District Court

For the Northern District of California

1    filed a request to dismiss the appeal, which was received by the Ninth Circuit on December

2    22, 2009.  The request was granted on December 29, 2009.

3        On January 24, 2010, Ms. Cotterill sent Mr. Haynes an e-mail stating that he was no

4    longer her attorney, and requesting that he return her file.  Mr. Haynes did not return the

5    file, and on March 2, 2010, Ms. Cotterill sent another note telling Mr. Haynes he no longer

6    represented her, and again requesting that he send her "all files and records in this case."

7    On April 30, 2010, Ms. Cotterill sent Mr. Haynes a third e-mail requesting return of her file,

8    and citing California Rule of Professional Conduct 3-700.  As of May 2011, he still had not

9    sent her the file.

10       Meanwhile, on March 10, 2010, Judge Larsen issued a report and recommendation,

11   recommending that the award of costs against Ms. Cotterill be vacated and that costs be

12   denied, but that sanctions be imposed against Mr. Haynes under 28 U.S.C. § 1927 for the

13   attorneys' fees incurred by defendants after November 5, 2008, the point at which it was

14   absolutely clear that the case had no merit.  Judge Larsen also found that Mr. Haynes'

15   conduct in the litigation was vexatious and unreasonable, and that he had made numerous

16   misrepresentations of fact to the court.

17       On May 11, 2010, Judge White adopted the report and recommendation, and

18   awarded sanctions against Mr. Haynes in the amount of $362,545.61, pursuant to 28

19   U.S.C. § 1927.  Judge White found that Mr. Haynes' inability to pay was not a relevant

20   consideration in determining whether to award sanctions under § 1927.  On June 14, 2010,

21   Mr. Haynes filed a notice of appeal of the order awarding sanctions.

22       On February 13, 2012, Mr. Haynes sent Ms. Cotterill an e-mail asserting that she

23   owes him $20,000 for costs incurred in the case, and threatening to sue her if she didn't

24   respond to the e-mail within five days.

25       The appeal of the sanctions order was argued and submitted on May 16, 2012.  On

26   July 23, 2012, the Ninth Circuit panel issued an opinion finding that Mr. Haynes had

27   engaged in a wide variety of incompetent and unprofessional actions in connection with his

28   representation of Ms. Cotterill, but remanding the case for consideration of whether the

7

1    amount of the sanctions was excessive in light of Mr. Haynes' ability to pay.  Also on July

2    23, 2012, the panel issued a memorandum decision affirming the sanctions order in all

3    other respects.  Mr. Haynes filed a petition for panel rehearing and a petition for rehearing

4    en banc.  The panel issued an order denying the petitions on November 5, 2012.

5              2.     The <u>Landry</u> case

6              In 2008, Marcus Landry and Daniel Landry retained Mr. Haynes to represent them in

7    connection with claims arising from incidents that had occurred in October 2007 and

8    October 2008, involving alleged unlawful searches and seizures and use of excessive force

9    by San Francisco Police Officers and private security officers.

10             Counsel held a conference on October 14, 2008, pursuant to Federal Rule of Civil

11   Procedure 26(f), which meant that initial disclosures were due on November 14, 2008.  On

12   February 25, 2009, some of the defendants served document requests and interrogatories

13   on plaintiffs, which meant that responses were due on March 26, 2008.  Notwithstanding

14   numerous meet-and-confer attempts on the part of the City, Mr. Haynes failed to serve

15   timely initial disclosures or responses to defendants' discovery.

16             On May 20, 2009, the City filed a motion to compel initial disclosures and responses

17   to interrogatories and requests for production.  The Hon. Samuel Conti referred all

18   discovery matters to Magistrate Judge Maria-Elena James.  The City subsequently filed a

19   motion for sanctions, seeking $1000 for the cost of filing the motion to compel.  Judge

20   James issued an order directing plaintiffs to provide the discovery by June 26, 2009, and

21   denying the motion for sanctions without prejudice to refiling if plaintiffs failed to provide the

22   discovery by the deadline.

23             On June 30, 2009, the City filed a renewed motion for sanctions, seeking $1500 on

24   the ground that the discovery had not been provided, and that the City had been forced to

25   file a motion to compel, file two joint letters to the court, file a written request for a

26   telephonic discovery conference, file two motions for sanctions, and participate in a one-

27   and-a-half hour in-person meet-and-confer – all because plaintiffs had failed to meet their

28   discovery obligations.  On July 30, 2009, Judge James issued an order awarding $1000 in

8

United States District Court

For the Northern District of California

1   sanctions against Mr. Haynes personally, and directing him to pay the sanctions by August

2   20, 2009.  Mr. Haynes did not pay the sanctions by that date.

3       Additional discovery disputes ensued, concerning, among other things, Mr. Haynes'

4   assertion of objections to the discovery requests to which he had failed to provide timely

5   responses, his failure to pay the sanctions ordered by the court, and plaintiffs' failure to

6   appear on the dates noticed for their depositions.  On August 24, 2009, Judge James

7   ordered the parties to appear at the court on September 8, 2009, for an in-person meet-

8   and-confer session.  After more than five hours, the parties were unable to agree to a

9   resolution of any of their disputes, with the exception of some tentative dates for the

10  plaintiffs' depositions.

11      The parties then filed joint letters summarizing their disputes and detailing the basis

12  of the disagreement.  On September 16, 2009, Judge James issued an order to show

13  cause why sanctions should not be imposed on plaintiffs' counsel, including further

14  monetary sanctions, as well as discovery sanctions (deeming certain disputed issues

15  admitted and barring the use of certain information).  The order stated, in part, that the

16  court had reviewed the discovery dispute letters, which involved "an issue that is becoming

17  all too familiar in this case" – the lack of compliance by plaintiffs' counsel with the orders of

18  the court, and "more generally, his duties as a lawyer" before the court.

19      Judge James directed Mr. Haynes to file a responsive declaration, and set a hearing

20  for October 8, 2009.  Mr. Haynes did file a declaration, in which he asserted that all the

21  problems at the meet-and-confer had been caused by the unreasonableness of counsel for

22  the City defendants – in particular, Daniel Zaheer.  Following the hearing on October 8,

23  2009, Judge James issued an order imposing a new deadline on Mr. Haynes to pay the

24  previously imposed $1500 in sanctions, and advising that if he failed to pay the sanctions

25  by that date (November 12, 2009), an additional $100 in sanctions would be added for each

26  additional day that the sanctions remained unpaid.

27      At the conclusion of the October 8, 2009 hearing, Mr. Haynes, Dirk Larsen (counsel

28  for the private security firm defendants), and Mr. Zaheer walked from the courtroom into the

corridor and began discussing deposition scheduling and other discovery-related matters. According to declarations provided by Mr. Larsen and Mr. Zaheer in support of the Committee's motion for summary judgment, Mr. Haynes first spoke with Mr. Zaheer, and then began speaking with Mr. Larsen.  While Mr. Haynes was speaking with  Mr. Larsen, Mr. Zaheer interposed a comment or question, whereupon Mr. Haynes told him not to interrupt.  Mr. Zaheer responded that he was not interrupting, but that even if he were, that would be fair because Mr. Haynes regularly interrupted him.

At this point, according to Mr. Larsen and Mr. Zaheer, Mr. Haynes flew into a rage, accosting Mr. Zaheer and spewing profanities.  Mr. Larsen believed that Mr. Haynes was about to strike Mr. Zaheer, and did not do so only because Mr. Zaheer backed away.  Mr. Zaheer states that Mr. Haynes brushed up against him and shouted threats and profanities, and that he was fearful for his physical safety.  Accordingly, Mr. Zaheer states,  he fled into Judge James' courtroom and asked court personnel to request the assistance of court security.  A few minutes later, Mr. Zaheer reported the assault to a deputy U.S. Marshal. The marshal began to question the attorneys, and when Mr. Haynes asked if he was being detained, the Marshal responded that he was.

Several deputy U.S. Marshals and Federal Protective Services ("FPS") officers then arrived on the scene.  The attorneys were separated and interviewed.  At one point, according to Mr. Zaheer, Mr. Haynes resumed yelling profanities.  When the officers approached, Mr. Haynes began yelling profanities at them as well.  One officer told Mr. Haynes he would need to leave the building, and he was escorted out of the building by several officers.

On October 21, 2009, Mr. Zaheer wrote a letter to Judge Conti, asking that all future depositions be taken at the federal courthouse, because of Mr. Haynes' behavior in connection with the October 8, 2009 incident.  On November 13, 2009, defendants submitted a case management conference statement, in which they also renewed the City's request that all future depositions be taken at the federal courthouse, and attached a copy of the FPS report of the October 8, 2009 incident.

1    Also on November 13, 2009, Mr. Haynes filed a declaration in response to Mr.

2    Zaheer's October 21, 2009 letter, in which he asserted that Mr. Zaheer's allegations were

3    "without merit," and were "merely conclusionary [sic] allegations without factual support."

4    He claimed that "[t]he allegations of profane name calling is [sic] disproved as there have

5    no [sic] allegation prior to the incident of any profane name calling and there has been

6    none."

7    Mr. Haynes denied that he had been angry with Mr. Zaheer, or that he had lost his

8    "composure" during the meet-and-confer on October 8, 2009 (or at any time prior to that

9    incident), and asserted that he had "walked to Mr. Zaheer due to his voice not being able to

10   carry and again asked him not to interrupt the conversion [sic] with Mr. Larsen," and that

11   Mr. Zaheer then said he had been assaulted and was going to get a marshal.  Mr. Haynes

12   also disputed the officers' accounts of the incident.

13   Mr. Haynes asserted further that prior to the "alleged incident," Mr. Zaheer's conduct

14   had been "outrageous."  Among other things, Mr. Haynes claimed that Mr. Zaheer "yells

15   over the phone and insults," and that he (Mr. Haynes) had repeatedly hung up rather than

16   respond to the yelling and insults.

17   On November 20, 2009, Judge Conti held a status conference in the case, at which

18   time the parties were advised that if they continued to fight with each other, the court would

19   issue sanctions:  "For plaintiff, I'm going to dismiss his complaint with prejudice.  For the

20   defendant, I'm going to get new attorneys to represent the defendant if the plaintiff behaves

21   himself. . . . And if anybody disrupts the orderly process of any case I'm handling, they are

22   going to go to jail.  Period."  The parties were further advised that any further disputes were

23   to be brought directly to Judge Conti.  The request to hold depositions in the courthouse

24   was denied.

25   On December 28, 2009, in response to a request made by defendants on November

26   11, 2009, Judge James issued an order requiring plaintiffs to provide discovery they had

27   thus far failed to provide, primarily regarding details of their arrest history and criminal

28   history, which defendants asserted was information central to plaintiffs' claims for damages.

This information had been requested in interrogatories propounded in February 2009, and also in prior depositions.  Judge James ordered plaintiffs to appear for supplemental deposition sessions, for which they would pay the cost.  Judge James also awarded sanctions in the amount of $835 to the City defendants, representing one-half of the cost of the prior deposition of Marcus Landry, finding that Mr. Haynes had "unreasonably multiplied these proceedings by obstructing and delaying" the deposition.  The court ordered that payment be made within 14 days.

Mr. Haynes did not file objections to the December 28, 2009 order, but rather simply took the position that the order was "null and void," based on Judge Conti's order at the November 20, 2009 status conference that all future disputes should be brought directly to him.  On January 27, 2010, the City defendants filed a request for clarification, seeking a determination as to whether Judge Conti's order was retroactive to the discovery disputes that had arisen prior to the November 20, 2009 status conference.

On February 3, 2010, Judge Conti issued an order stating that because Judge James' December 28, 2009 order related to a dispute that was pending before her prior to the November 20, 2009 status conference, the order was to have "full force and effect." Judge Conti again reminded the parties that the court "can and will issue sanctions, up to and including dismissal of this action, should the parties' misconduct and meritless disagreement continue."  Counsel for the City defendants attempted to meet and confer with Mr. Haynes regarding a schedule for complying with Judge James' order, but, according to Mr. Zaheer, Mr. Haynes failed to respond.

On February 26, 2010, defendants filed a motion for terminating sanctions, or, in the alternative, issue sanctions and further monetary sanctions, based on plaintiffs' repeated failure to comply with court orders regarding discovery.  In response, Mr. Haynes took issue with the propriety of the discovery requests, asserting that plaintiffs had fully responded to all discovery (or that any failure to respond had been due to "reasonable mistake and neglect"), that there were no issues as to which supplemental deposition sessions were required, and that any problems that had occurred during the course of discovery had been

United States District Court

For the Northern District of California

1    the fault of Mr. Zaheer (who, according to Mr. Haynes, had among other things falsely

2    accused Mr. Haynes of assaulting him, and behaved in an "aggressive" manner towards

3    Marcus Landry during his deposition).  On April 9, 2010, Judge Conti issued an order

4    granting the motion for terminating sanctions, and dismissing the case with prejudice.

5        On May 10, 2010, plaintiffs filed a notice of appeal.  Initially, the Ninth Circuit set an

6    August 17, 2010 date for appellants to file their opening brief.  Between that time and

7    August 30, 2011, Mr. Haynes on behalf of plaintiffs/appellants filed eight requests for

8    extensions of time to file the opening brief and excerpts of record.  The last two requests

9    were denied, and the appeal dismissed with prejudice, for failure to prosecute, on

10   September 12, 2011, more than 17 months after the filing of the notice of appeal.

11       3.    Other Actions

12       The Standing Committee identified five other cases in which it asserts that Mr.

13   Haynes failed to comply with rules or otherwise engaged in misconduct.  Two of those

14   cases are state court cases, which do not concern this court in connection with the present

15   petition.  Three are cases filed in this district.

16       In Estate of Finau Tapueluelu v. City and County of San Francisco, C-04-1612 CRB

17   (N.D. Cal.), the court found that, less than a month before the scheduled trial date, Mr.

18   Haynes had failed to provide defendants with any of the discovery that had been

19   requested.  Although the court did not sanction Mr. Haynes, it directed that all discovery be

20   provided within a week, and counseled that sanctions, including issue and witness

21   preclusion, could be imposed if he failed to do so.

22       In Edgerly v. City and County of San Francisco, C-03-1269 WHA (N.D. Cal.), the

23   court imposed sanctions pursuant to Federal Rule of Civil Procedure 11 and 28 U.S.C.

24   § 1927 against the plaintiff and his attorney, Mr. Haynes.  The Ninth Circuit affirmed the

25   imposition of sanctions.  See Edgerly v. City and County of San Francisco, 599 F.3d 946,

26   962-63 (9th Cir. 2010).

27       In Gillis v. City and County of San Francisco, C-08-3871 RS (N.D. Cal.), Mr. Haynes

28   repeatedly referred to opposing counsel (during the course of a May 8, 2009, deposition,

1   and otherwise), as a "poor little white girl."  It does not appear that Mr. Haynes was

2   sanctioned for any improper behavior during the course of this litigation.  However, the

3   Hon. Richard Seeborg granted defendants' motion for summary judgment on September

4   21, 2011.

5        Plaintiffs filed a notice of appeal on October 21, 2011.  Mr. Haynes then filed five

6   requests for extensions of time to file the opening brief.  In granting the fifth request, the

7   Ninth Circuit set a deadline for filing the opening brief, and advised that failure to file within

8   that deadline would result in the appeal being dismissed with prejudice.  The appeal was

9   fully briefed as of January 29, 2013.

10  B.    Procedural Background

11       On October 14, 2010, following the quorum vote, the Committee initiated this matter

12  by filing a petition pursuant to Civil Local Rule 11-7(c)(3), seeking an order to show cause

13  why Mr. Haynes should not be removed from the bar of the Northern District.  In the

14  petition, the Committee asserted that Mr. Haynes had violated his duties to his clients and

15  to the court, and had demonstrated disregard for the court's disciplinary process.  The

16  Committee also filed a proof of service showing service on Mr. Haynes at 1443 Fillmore

17  Street, Suite 194, San Francisco, California, via certified mail.

18       On February 10, 2011, the court held a case management conference.  Counsel for

19  the Committee appeared.  Mr. Haynes did not appear.  On February 11, 2011, the court

20  issued an order directing Mr. Haynes to appear on April 20, 2011, to show cause why he

21  should not be disciplined.

22       On February 16, 2011, the envelope addressed to Mr. Haynes containing the order

23  to show cause was returned to the court as undeliverable.  It was addressed to 1443

24  Fillmore Street, Suite 194, the address provided to the court by the Committee.

25       On April 20, 2011, the court held the show cause hearing.  Counsel for the

26  Committee appeared.  Mr. Haynes did not appear.  The court directed counsel for the

27  Committee to file a motion for summary judgment by June 1, 2011.  The Committee filed its

28  motion for summary adjudication of disbarment on June 1, 2011, along with proposed

United States District Court
For the Northern District of California

14

1  findings.  The motion was served on Mr. Haynes at the address listed above.  No

2  opposition was filed.

3       On June 22, 2011, the Committee filed a reply brief, and counsel also filed a

4  declaration attaching e-mail correspondence between himself and Mr. Haynes dated earlier

5  in June 2011.  In the e-mails, Haynes asserted that he had not received the petition, and

6  only received the motion on June 17, 2011.  Counsel for the Committee also provided a

7  copy of the return receipt for the mailing of the motion by certified mail, and the Postal

8  Service's record of delivery on June 2, 2011.

9       On June 23, 2011, Mr. Haynes filed a motion to dismiss the petition, or, in the

10 alternative, for additional time to respond to the summary judgment motion, on the basis

11 that the petition had never been served on him.  He also requested that the court file be

12 unsealed, claiming that he had been "denied access" to the file, and that unsealing it would

13 lessen the costs of litigation; and in addition requested that the matter be referred to a

14 judge outside this district.  This was Mr. Haynes' first appearance in the case.  The address

15 shown on the caption page on his motion was 1443 Fillmore, #194.

16      On June 27, 2011, the Committee filed an opposition to the motion.  Four days later,

17 on July 1, 2011, the Committee filed a "Notice of Errata," stating that it had determined that

18 the papers filed in connection with the motion for summary judgment were mailed to an

19 improper address – 1443 Fillmore Street, Suite 194.  The correct address was 2443

20 Fillmore Street, Suite 194.  Accordingly, the Committee requested that Mr. Haynes be given

21 additional time to prepare his response.

22      Also on July 1, 2011, the court issued an order denying the motion to dismiss, the

23 motion to unseal, and the request to transfer the case outside the district, and granting the

24 request for additional time to oppose the motion for summary judgment.  The new date for

25 filing the opposition was July 20, 2011, and the date for filing the reply was July 27, 2011.

26 The hearing was set for August 10, 2011.  The court also directed Mr. Haynes to provide

27 the court with a correct address.

28      On July 5, 2011, Mr. Haynes filed a "Correction and/or Change of Address," in which

1  he stated that his address was 2443 Fillmore, #194.  He conceded that he had previously

2  put the address of 1443 Fillmore, #194, on his June 23, 2011 motion to dismiss, but

3  claimed that "[t]he error on the June 23, 2011 caption was made due to the proof of service

4  made by the attorneys representing Standing Committee for Professional Responsibility in

5  this matter."

6        Also on July 5, 2011, counsel for the Committee wrote a letter conceding that Mr.

7  Haynes had previously been served at the wrong address, and requesting that the court

8  give Mr. Haynes an opportunity to respond to the order to show cause rather than being

9  required to respond to the summary judgment motion.  The court agreed, and on July 7,

10  2011, issued an order recalling the February 1, 2011 order to show cause, and issuing a

11  second order to show cause, and also terminating the summary judgment motion.

12        In the second order to show cause, the court directed Mr. Haynes to appear at a

13  hearing on September 7, 2011.  The court also advised that he could respond in writing, no

14  later than three weeks prior to the hearing.

15        On August 17, 2011, Mr. Haynes filed a response to the petition and the order to

16  show cause.  In this response, he made a number of procedural objections relating to the

17  actions of the Committee prior to filing the petition, including efforts to obtain his "consent"

18  to the proposed discipline, the service of the petition on him, and the issuance of the

19  subpoena.  He also argued that Ms. Hoeper had some improper motive in sending the

20  letter to Judge Walker, that Judge Walker had some improper motive in referring the matter

21  to the Committee, and that the members of the Committee had some improper motive in

22  acting to institute this proceeding.

23        Mr. Haynes asserted that Ms. Hoeper's February 18, 2010 letter was an improper

24  "ex parte communication with a judge on pending matters," in violation of Civil Local Rule

25  11-4(c), because at the time the letter was submitted, the Cotterill, Landry, and Gillis cases

26  were all still pending; that the referral was improper because Ms. Hoeper "clearly made

27  misstatements of facts" in the letter to Judge Walker, regarding statements made by Mr.

28  Zaheer and Mr. Haynes, and regarding the prior incidents in the Landry and Gillis cases;

United States District Court

For the Northern District of California

1    that the referral to the Committee was improper under Local Rule 11-6(a)(4), because

2    Judge Walker did not have a belief that Mr. Haynes had engaged in unprofessional

3    conduct, and because he failed to refer the matter to the Committee "in writing," as required

4    by Local Rules 11-6(a) and 11-7(c); that the Committee had filed the petition prior to

5    obtaining Mr. Haynes' consent, in violation of Local Rule 11-7(c)(3); that Judge Walker's

6    issuance of the subpoena was improper under Local Rule 11-7(c)(1), because he was the

7    referring judge; and that the petition was improper because it did not specifically identify the

8    alleged misconduct, as required by Local Rule 11-7(c)(3).

9          On August 30, 2011, eight days before the scheduled show cause hearing, Mr.

10    Haynes filed a motion to disqualify the undersigned district judge, claiming that she was

11    biased against him in that she had allowed the Committee to continue to send mail to the

12    incorrect address, and had not verified the address.  The motion to disqualify was referred

13    for assignment to another judge of this court, and on September 2, 2011, it was referred to

14    the Hon. Saundra Brown Armstrong.  The Committee filed an opposition on September 13,

15    2011.  On September 16, 2011, Judge Armstrong issued an order denying the motion.

16          On September 29, 2011, the court set another date for the show cause hearing –

17    January 18, 2012.

18          On October 7, 2011, Mr. Haynes wrote a letter to Judge Armstrong, complaining that

19    he had not been served with a copy of the Committee's opposition by e-mail until after the

20    order denying the motion had already been issued.  He asserted that the parties had

21    previously been directed by the court to serve courtesy copies by e-mail as well as by

22    regular mail.  He complained that he had been denied the opportunity to file a reply.

23          On October 11, 2011, Mr. Haynes filed a lawsuit in this court alleging various

24    constitutional claims, based on the October 8, 2009 incident, and naming as defendants

25    "Christian Hanson, Brenda Tolbert, Doe Almarz [sic], Philip Coughlin, Moseh P. Obersein

26    [sic], Dennis Herrera, Joane [sic] Hoeper, Daniel Murphy and Daniel Zaheer."  See Haynes

27    v. Hanson, Case No. C-11-5021 JST.

28          On October 27, 2011, Judge Armstrong vacated the September 16, 2011 order and

1   granted Mr. Haynes' request for leave to file a reply.  On November 9, 2011, Mr. Haynes

2   filed a reply.  On January 11, 2012, the court issued an order vacating the show cause

3   hearing, pending Judge Armstrong's ruling on the motion to disqualify.  On January 18,

4   2012, Judge Armstrong issued an amended order denying the motion to disqualify.

5          On January 23, 2012, the court set a new date for the show cause hearing –

6   February 29, 2012.  At the hearing, both Mr. Haynes and counsel for the Committee

7   presented proposals and arguments with regard to procedures to be followed in addressing

8   the issues raised in the petition.  Mr. Haynes suggested that he needed a year to conduct

9   discovery, to include the depositions of his clients, opposing counsel, the U.S. Marshals,

10  court personnel, judges, and members of the Committee.  The Committee believed that the

11  petition could be resolved on the undisputed facts.

12         The court determined that the issues could not be resolved based on the petition

13  alone (and the response thereto) given the existence of certain factual disputes.  However,

14  Mr. Haynes' oral representation also suggested that he might be seeking unnecessary,

15  unreasonable, or inappropriate discovery.  As a result, the procedure elected by the court

16  was, first, to have the Committee re-file its motion for summary judgment, which would be

17  revised so as to eliminate as many factual disputes as possible, and then, to have Mr.

18  Haynes file an affidavit pursuant to Rule 56(d), if in his view he needed discovery to

19  respond to the revised motion for summary judgment, so that appropriate discovery could

20  be identified.

21         The court directed the Committee to re-file its motion for summary judgment by

22  March 7, 2012, and advised Mr. Haynes that he would have until April 6, 2012 to decide

23  whether he would require discovery to oppose the motion, and if so, to make a request

24  specifying the discovery needed.  The court advised that the Committee could respond to

25  that request, and that the court would then issue an order outlining the discovery that would

26  be permitted, and setting discovery deadlines.  If Mr. Haynes did not seek discovery, his

27  opposition to the motion would be due April 20, 2012, and the reply would be due April 27,

28  2012.

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

1    At various points throughout the hearing, Mr. Haynes emphatically renewed his

2    request to unseal the case.  The court advised him that the file was sealed for his benefit.

3    Mr. Haynes argued, however, that he wanted it unsealed because he was attempting to

4    obtain representation, but the fact that the file was sealed made it "difficult" to him to

5    "communicate with other lawyers."  In addition, he asserted that he needed "protection"

6    from what he believed was the "bias" of the court and the Committee against him; and that

7    he might lose copies of documents from the file, but would be unable to obtain copies from

8    the clerk's office if the file remained sealed.  The Committee opposed the request, but only

9    on the basis that Ms. Cotterill objected to having her confidential communications

10   disclosed, to which Mr. Haynes responded that Ms. Cotterill had already made those

11   communications part of the public record.  The court took the request under submission,

12   and after due consideration of Mr. Haynes' strong insistence that the file be unsealed,

13   issued an order unsealing the case on March 1, 2012.

14   C.    The Committee's Motion for Summary Judgment

15        The Committee filed its renewed motion for summary judgment on March 7, 2012.

16   The Committee argues that in the course of the above-described litigation, Mr. Haynes has

17   failed in his duty to communicate with his clients, pursued unmeritorious claims, and

18   displayed a lack of diligence and competence, has repeatedly directed derogatory and

19   profane statements towards opposing counsel and has engaged in physical threats and

20   intimidation, and that these actions constitute a pattern of misconduct, providing a basis for

21   the court to disbar Mr. Haynes from practice in this court.

22        After setting forth the facts in the Cotterill case, the Landry case, and the other three

23   cases (Gillis, Estate of Tapueluelu, and Edgerly) and describing its investigation of the

24   circumstances set forth in Joanne Hoeper's letter to Judge Walker, the Committee argues

25   that the court has the authority to disbar Mr. Haynes, and that an attorney subject to

26   disciplinary proceedings is entitled to notice and an opportunity to respond, which is what

27   Mr. Haynes has been given here.

28        The Committee contends that Mr. Haynes violated his duties to his client Ms.

United States District Court
For the Northern District of California

1  Cotterill by failing to keep her reasonably informed about significant developments related

2  to the case, in that he failed to inform her that he did not file a timely opposition to the

3  summary judgment motion and that the court issued an order to show cause why the case

4  should not be dismissed for failure to prosecute; failed to inform her about the court order

5  granting summary judgment for defendants; and failed to respond to her specific question

6  as to whether he had filed a notice of appeal.  In addition, he failed to follow her instruction

7  regarding the filing of the notice of appeal and violated his obligation to return the client file

8  when asked to do so.

9        Second, the Committee argues that Mr. Haynes violated his duties to multiple clients

10  by failing to perform legal services competently, in that he failed to serve discovery

11  responses in Landry and Tapueluelu, with the result in Landry that the court entered

12  terminating sanctions.

13        Third, the Committee asserts that Mr. Haynes violated his duty to be truthful in his

14  communications with the court, in that he filed a declaration on November 13, 2009 in the

15  Landry case, in which he sought to mislead the court regarding his own involvement in the

16  October 8, 2009 incident outside Judge James' courtroom; and made false statements to

17  the court in the course of the Cotterill case, as determined by Judge Larsen in the report

18  and recommendation regarding sanctions.

19        Fourth, the Committee contends that Mr. Haynes violated his obligation to practice

20  with honesty, care, and decorum required for the fair and efficient administration of justice,

21  as evidenced by his abuse of opposing counsel, the Deputy U.S. Marshals, and the FPS

22  officers during the course of the October 8, 2009 incident.

23        Fifth, the Committee argues that Mr. Haynes violated his obligation to cooperate with

24  the Committee's investigation, by refusing to speak to the Committee, refusing to provide

25  his rendition of the events, and refusing to make himself available for service of a

26  subpoena.

27        Sixth, the Committee contends that Mr. Haynes continues to demonstrate no

28  contrition or even any appreciation of the wrongfulness of his conduct.

United States District Court
For the Northern District of California

1    D.    The Revised Request for Discovery

2            On April 6, 2012, Mr. Haynes filed a declaration in support of his request for

3    discovery to oppose the summary judgment motion.  On April 9, 2012, he filed a

4    supplemental declaration.  Also on April 9, 2012, the Committee filed a response to Mr.

5    Haynes' application for discovery.

6            On July 6, 2012, the court issued a 25-page order denying the Rule 56(d)

7    application, and specifying procedures and issues for determination.  In this order, the court

8    described in some detail the events that occurred in the <u>Cotterill</u> and <u>Landry</u> cases that

9    formed the basis of the petition, and also briefly discussed the three additional cases –

10   <u>Estate of Tapueluelu</u>, <u>Edgerly</u>, and <u>Gillis</u>.

11          The court distinguished the conduct for which Mr. Haynes had previously been

12   sanctioned in <u>Cotterill</u> and <u>Landry</u> from the conduct for which the Committee was seeking

13   disbarment in the present action, and also noted that Mr. Haynes had not previously been

14   sanctioned for any conduct in <u>Gillis</u>.  The court concluded that it could not discipline Mr.

15   Haynes for misconduct for which he had already been sanctioned by a judge of this court,

16   and set forth the issues that could legitimately be considered as part of the present

17   proceeding:

18          [W]hether Mr. Haynes violated the rules of ethics and professional
             responsibility with regard to the duties owed to his clients in <u>Cotterill</u> and
19          <u>Landry</u>; whether he violated the rules of ethics and professional responsibility
             in connection with his behavior towards opposing counsel in <u>Cotterill</u>, <u>Landry</u>,
20          and <u>Gillis</u>; and whether he violated his duty of honesty and candor to the court
             in connection with the October 8, 2009 incident in <u>Landry</u>; and if so, what
21          disciplinary action should be taken.

22   July 6, 2012 Order at 18.

23          The court also reviewed the procedural objections, previously set forth in Mr.

24   Haynes' August 17, 2011 response to the order to show cause.  The court found that Ms.

25   Hoeper's letter was not an improper ex parte communication with a judge regarding a

26   pending matter, in part because the <u>Cotterill</u>, <u>Landry</u>, and <u>Gillis</u> cases were assigned to

27   judges other than Judge Walker.  The court found further that the question whether any

28   statements in Ms. Hoeper's letter were false was not relevant to the propriety of the referral;

United States District Court
For the Northern District of California

1   and that in any event, if Mr. Haynes had been concerned that the referral was based on

2   false information, he could have agreed to meet with the Committee to discuss the

3   substance of the charges before the petition was filed (which he refused to do).  Finally, the

4   court found that even if it was true, as Mr. Haynes asserted, that Judge Walker violated

5   Local Rules 11-7 and 11-6, any such violation did not deprive Mr. Haynes of due process or

6   prejudice him in any way, and thus provided no basis for dismissing the petition or denying

7   the Committee's motion for summary judgment.

8          As for Mr. Haynes' Rule 56(d) request, the court found that he was still seeking

9   unnecessary, unreasonable, and inappropriate discovery.  The bulk of Mr. Haynes'

10  declaration consisted of a list of various types of proposed discovery including depositions,

11  document requests, and what appeared to be interrogatories.  The court found that he had

12  not met his burden of identifying relevant information and showing how it was essential to

13  oppose the Committee's motion for summary judgment, as required under Rule 56(d).

14  See, e.g., Moss v. U.S. Secret Serv., 572 F.3d 962, 966 N.3 (9th Cir. 2009); Family Home

15  & Fin. Ctr., Inc. v. Federal Home Loan Mortg. Corp., 525 F.3d 822, 827 (9th Cir. 2008);

16  Tatum v. City and County of San Francisco, 441 F.3d 1090, 1100 (9th Cir. 2006).  Nor had

17  he met his burden of putting forth sufficient facts "to show that the evidence sought exists."

18  Volk v. D.A. Davidson & Co., 816 F.2d 1406, 1416 (9th Cir. 1987); see also Roberts v.

19  McAfee, Inc., 660 F.3d 1156, 1169 (9th Cir. 2011).

20         In addition, with regard to the proposed depositions, the court found, in light of the

21  type of conduct that is at issue in this proceeding, that it would serve no good end to allow

22  Mr. Haynes to depose the eleven proposed witnesses.  The court advised that should Mr.

23  Haynes succeed in submitting some reasonable explanation as to what relevant information

24  he believed any particular witness might have, and why such information was necessary to

25  oppose the motion for summary judgment, the court would conduct an evidentiary hearing,

26  at which time Mr. Haynes and the Committee would be permitted to call witnesses

27  identified by the court as necessary.

28         The court elected to follow this procedure – to conduct an evidentiary hearing rather

**United States District Court**
For the Northern District of California

1   than allowing Mr. Haynes to depose witnesses – for several reasons.  These included the

2   nature of allegations in the petition, including the allegation that Mr. Haynes had verbally

3   abused opposing counsel in e-mails and at depositions, and at the courthouse following

4   court proceedings; the conduct by Mr. Haynes that prompted requests from opposing

5   counsel to have depositions conducted at the courthouse, and that necessitated law

6   enforcement assistance; and the general nature of Mr. Haynes' rambling, unfocused, semi-

7   coherent responses to the court's questions, and similar argument in his papers.

8       As for Mr. Haynes' proposed witnesses, the court found that there was no factual

9   dispute with regard to the events that formed the basis of the Committee's charge that Mr.

10   Haynes had failed to communicate with Ms. Cotterill, had failed to keep her advised of

11   rulings in her case, had failed to follow her instructions regarding the filing of the appeal,

12   and had failed to return her client file when she requested that he do so.  Because all those

13   events were established in the record, the court found no reason for Ms. Cotterill to testify

14   as to her personal knowledge.

15       With regard to Ms. Cotterill's mother, Jean Cotterill, the court found that Mr. Haynes

16   had not established any basis to call her as a witness, as she was not his client, and was

17   not a witness to the conduct by Mr. Haynes that formed the basis of the present

18   proceedings.

19       With regard to Mr. Pratt, the court found that the claims arising out of Mr. Haynes'

20   conduct were based on the e-mails he had sent Mr. Pratt, and thus, there was no reason

21   for Mr. Pratt to testify as to his own personal knowledge.

22       With regard to Ms. Osborn, the court found that the claims arising out of Mr. Haynes'

23   conduct during the deposition in the Gillis case were entirely reflected in the deposition

24   transcript, and thus, there was no need for Ms. Osborn to testify regarding her personal

25   knowledge.

26       With regard to Judge James' courtroom deputy, Ms. Tolbert, the court found that

27   because she was not a percipient witness to the incident that occurred on October 8, 2009

28   in the hallway outside Judge James' courtroom, and because her involvement was limited

United States District Court
For the Northern District of California

to placing a call to court security, she could not be questioned as to the conduct of Mr.
Haynes and/or Mr. Zaheer while they were outside the courtroom, and thus there was no
reason for her to testify.

With regard to Captain Mahoney, the San Francisco Police Officer who prepared the
police report of the incident, based on Mr. Zaheer's account of the events, the court noted
that it was not clear from the Rule 56(d) request exactly what personal knowledge Mr.
Haynes believed Captain Mahoney might have regarding the incident itself, and that
without more, the court would not permit Mr. Haynes to call Captain Mahoney as a witness.

Similarly, the court found that many of the proposed document requests appeared to
seek information that was plainly not relevant to the specific allegations of misconduct that
form the basis of the petition and the motion for summary judgment.  These included
(a) correspondence between Ms. Cotterill and any attorneys she may have contacted after
the court granted defendants' motion for summary judgment; (b) e-mails or other
correspondence sent to Joan Cotterill (Ms. Cotterill's mother); (c) correspondence between
the Committee and Mr. Pratt, Mr. Zaheer, Ms. Tolbert, Ms. Baumgartner, Ms. Hoeper, or
the court; (d) documents from the City Attorney's Office relating to the employment of, or
regarding evaluations of or complaints concerning, Mr. Zaheer or Ms. Osborn;
(e) documents relating to a police report regarding the October 8, 2009 incident, and/or the
use of said police report; (f) correspondence between Judge Walker or anyone in his office
and Judge Larsen; or between Judge Walker and Ms. Hoeper; (g) notices or e-mails sent
by Ms. Hoeper regarding any requirement that depositions be taken in a secured facility; (h)
documents regarding the Committee's decision to file the petition, or documents or other
information relating to the service of the petition and the order to show cause, or to the
issuance of the subpoena; (i) documents regarding the relationship of any Committee
members to the City Attorney's Office; and (j) documents or other information regarding
other disciplinary actions referred to the Committee.

While the court declined to permit discovery relating to undisputed issues raised by
the petition and motion for summary judgment with regard to the Cotterill case, the

United States District Court
For the Northern District of California

1    Landry case, and the Gillis deposition, the court noted that certain other facts relating to the

2    October 8, 2009 incident outside Judge James' courtroom were disputed, including whether

3    Mr. Haynes lost his composure, used profane language, and/or assaulted Mr. Zaheer,

4    whether he was "provoked" by the security officers during their on-scene investigation of

5    that incident, and whether he knowingly sought to mislead the court regarding his behavior

6    during that incident.

7         The court determined that evidence regarding these disputed issues would most

8    effectively be obtained by means of live testimony during an evidentiary hearing to be

9    conducted at the court, and that it appeared highly unlikely that any discovery would be

10   warranted.  Nevertheless, the court afforded Mr. Haynes one additional opportunity to

11   provide a Rule 56(d) declaration identifying more focused discovery, and explaining the

12   reasons such discovery was necessary to oppose the motion as to the issues identified by

13   the court as properly before it; and indicated that it would reconsider whether to allow any

14   discovery to go forward.

15        The court directed that no later than July 20, 2012, Mr. Haynes could submit a

16   revised Rule 56(d) affidavit (if needed); and that otherwise, his opposition to the summary

17   judgment motion would be due by August 5, 2012.  The court also ordered Mr. Haynes to

18   provide a statement by July 20, 2012 indicating whether he wanted to proceed under the

19   former version of Civil Local Rule 11 or the revised version that had become effective on

20   July 2, 2012.  The court attached copies of the two versions of Local Rule 11, to assist Mr.

21   Haynes in making the election.

22        On July 13, 2012, Mr. Haynes filed an administrative motion requesting a

23   continuance of the July 20, 2012 date to October 1, 2012, on the basis that he had a jury

24   trial beginning July 16, 2012 and would be too busy to comply with the order by July 20,

25   2012.

26        On August 1, 2012, the court issued an order granting Mr. Haynes until August 20,

27   2012 to file a statement electing the version of the local rules under which he wished to

28   proceed, and to file the revised Rule 56(d) affidavit, adding that if he did not file a Rule

United States District Court

For the Northern District of California

1    56(d) affidavit, his opposition to the summary judgment motion would be due on August 27,

2    2012.  The court indicated that no further continuances would be granted, and that if Mr.

3    Haynes failed to file the statement regarding the election of rules by August 20, the court

4    would decide which version of the rules to apply; and also that if he failed to file a Rule

5    56(d) affidavit and then failed to file an opposition to the motion by August 27, the court

6    would consider the motion to be unopposed.

7         On August 13, 2012, Mr. Haynes filed a motion for an extension of time to file his

8    statement regarding the election of rules, and his revised Rule 56(d) affidavit.  He claimed

9    that he had a reply brief due in the <u>Gillis</u> appeal on August 21, 2012, which he argued

10   would make the August 20, 2012 date "difficult to meet."  On August 14, 2012, the court

11   issued an order denying the motion, noting that the election of a particular version of the

12   local rules was not an onerous task, and also noting that Mr. Haynes had had more than

13   five months (since the Committee had filed its renewed motion for summary judgment) to

14   consider what discovery he might require to oppose the motion, and furthermore, that the

15   court had previously directed that no further continuances would be granted.

16        Mr. Haynes did file his Rule 56(d) affidavit on August 20, 2012, although he also

17   complained that he needed additional time because he was in trial every day until 5:00

18   p.m., and that he had an appellate brief due the following day.  As for his election of rules,

19   he stated that he objected to proceeding under either version, because "by agreeing to

20   proceed under any provision, respondent may be waving [sic] rights it [sic] does not intend

21   to waive."

22        On September 5, 2012, the court issued an order regarding Mr. Haynes' requested

23   discovery, reiterating that it would hold an evidentiary hearing in lieu of allowing him to

24   depose any witnesses.  This was in line with the July 6, 2012 order, where the court found

25   that given the circumstances that had led to the filing of the disciplinary proceeding, Mr.

26   Haynes could not be permitted to conduct unsupervised depositions of the witnesses to the

27   October 9, 2008 altercation outside Judge James' courtroom.

28        On September 20, 2012, Mr. Haynes filed a "Meet and Confer Statement" in which

United States District Court

For the Northern District of California

1   he repeated his request for additional time to prepare for the evidentiary hearing, and

2   expressing his dissatisfaction with the court's order allowing no written discovery or formal

3   depositions, and requiring an evidentiary hearing in lieu of depositions.  He stated that he

4   did not understand why the court would not permit him to depose the witnesses, asserting

5   that he had taken "hundreds of depositions of dishonest and unethical, hostile, violent, and

6   mean persons, all without incident and always extending them polite treatment."  He

7   claimed that discovery was "needed because of the unethical conduct of the [C]ommittee,"

8   and because "the issue of retaliation needs further addition."

9        On September 21, 2012, the court set the date for the evidentiary hearing on

10  October 16, 2012.

11  E.    The Evidentiary Hearing

12       The evidentiary hearing was conducted so that witnesses could be questioned in the

13  presence of the court with regard to the incident that occurred on October 8, 2009, in the

14  public corridor outside Judge James' courtroom, on the 15th floor of the Federal Building,

15  450 Golden Gate Avenue, San Francisco.  Mr. Haynes represented himself at the hearing.

16       At the commencement of the hearing, the court identified the disputed facts to be

17  determined by the testimony at the hearing as whether Mr. Haynes lost composure, used

18  profanity, or otherwise assaulted the Deputy City Attorney (Mr. Zaheer) outside of Judge

19  James' courtroom; whether or not Mr. Haynes was provoked by security officers during the

20  course of their on-scene investigation of that incident; and whether Mr. Haynes knowingly

21  sought to mislead the court regarding his behavior.

22       Four witnesses to the incident appeared at the hearing – Daniel Zaheer, Codelle

23  Phillimore, Christian Hanson, and Dirk Larsen.  The Committee called Mr. Zaheer, Ms.

24  Phillimore, and Mr. Hanson, all of whom Mr. Haynes cross-examined.  Mr. Haynes called

25  Mr. Larsen, who was also cross-examined by counsel for the Committee.

26       1.    Daniel Zaheer

27       Mr. Zaheer testified that after the hearing before Judge James, he, Mr. Haynes, and

28  Mr. Larsen were immediately outside the doors of the courtroom discussing discovery

United States District Court

For the Northern District of California

1    issues.  Mr. Zaheer and Mr. Haynes had a brief conversation, and then Mr. Haynes turned

2    to begin speaking to Mr. Larsen.  Mr. Haynes and Mr. Larsen were seated and Mr. Zaheer

3    was standing several feet away.

4         At one point, Mr. Zaheer made a comment about one of the discovery issues, and

5    Mr. Haynes responded, "Don't interrupt me," or words to that effect.  Mr. Zaheer responded,

6    "I did not interrupt you, but if I did, it would be fair because you interrupt me all the time and

7    have been interrupting me throughout this litigation."

8         At that point, according to Mr. Zaheer, Mr. Haynes stood up and "started

9    approaching me quite aggressively."  He also began using a lot of profanity.  Mr. Zaheer

10   recalled Mr. Haynes saying, "Shut the fuck up" or "You need to learn to fucking listen," and

11   also recalls Mr. Haynes telling him to "grow the fuck up."  As Mr. Haynes approached, Mr.

12   Zaheer began stepping backwards "because he was essentially charging towards me."  Mr.

13   Zaheer was concerned that Mr. Haynes was going to come into physical contact with him.

14        As Mr. Haynes approached very close, Mr. Zaheer felt it was clear that Mr. Haynes

15   was challenging him to a fistfight.  According to Mr. Zaheer, while Mr. Haynes started out

16   about an arm's length away, he moved until his face was less than six inches away from

17   Mr. Zaheer's, and his body was brushing up against Mr. Zaheer's body or very close to it.

18        Mr. Zaheer said something to the effect of "You're assaulting me.  You need to move

19   back.  If you don't move back . . . I'm going to go get a marshal."  According to Mr. Zaheer,

20   Mr. Haynes' response was, in substance, "Go get a fucking marshal."  Mr. Zaheer testified

21   that Mr. Haynes' tone was "belligerent," and that the volume was "very high" – that Mr.

22   Haynes was yelling at him, as when he said, "Shut the fuck up."

23        During this time, Mr. Zaheer testified, Mr. Haynes continued to swear, saying

24   something to the effect of "I should have knocked you out when you were pointing your

25   . . . fucking finger in my face at the fucking thing," or "I should have knocked the shit out of

26   you."

27        By that time, Mr. Zaheer asserts, he had been backed into the wall, so he ducked

28   through the courtroom doors, which were next to him, and went into the courtroom.  Once

1   inside the courtroom, he asked the courtroom deputy to call the marshals.  The courtroom

2   deputy then placed a telephone call, and after she had finished, Mr. Zaheer went back

3   outside the courtroom.

4        Mr. Zaheer testified that when the FPS officers arrived, Mr. Haynes was "extremely

5   belligerent."  He was "yelling" or "screaming" at them.  He was also directing statements at

6   Mr. Zaheer, such as "Shut the fuck up," and "Little fuckhead."  Mr. Zaheer felt that Mr.

7   Haynes was "inviting a physical confrontation with the security guards," as he was

8   screaming at Mr. Zaheer and at the guards, and had also "physically put himself in very

9   close distance with one of the security guards and was behaving similarly as he had to me

10  initially, which was . . . getting in the guy's face and . . . inviting a fistfight."

11       At some point, Deputy U.S. Marshal Christian Hanson arrived.  Mr. Zaheer testified

12  that he related the incident to Deputy Hanson, stating that he had been assaulted, and that

13  he had felt threatened and intimidated (although he also said that Mr. Haynes had not

14  punched him or struck him).  Mr. Zaheer recalls Mr. Haynes asking Deputy Hanson if he

15  was being detained, to which Deputy Hanson responded that he was.  Mr. Zaheer testified

16  that he told Deputy Hanson that he did not want Mr. Haynes detained – that he just wanted

17  the incident to be recorded.

18       Mr. Zaheer also testified that after the FPS officers arrived, a witness, Codelle

19  Phillimore, approached and told him she had seen the interaction, adding that in her view,

20  Mr. Haynes seemed very unstable.  Mr. Zaheer asked for her telephone number, and she

21  provided it, although Mr. Zaheer felt that she really did not want to get involved.

22       At some point, one of the officers told Mr. Zaheer to sit down, and he was

23  interviewed by the officer.  He also made contemporaneous notes of the incident, and

24  some additional notes shortly thereafter; the paper containing those notes was made an

25  exhibit at the hearing.

26       On cross-examination, in response to Mr. Haynes' questions, Mr. Zaheer testified

27  that there had been "a lot of difficulty" in the meet-and-confers during the Landry litigation,

28  and that Mr. Haynes used profanity on the phone and in person, such as calling him a

United States District Court

For the Northern District of California

1    smart mouth, childish, and immature, while accusing him of making "fucked up comments."

2          Later in the hearing, after the examination of the witnesses had concluded, Mr.

3    Haynes stated to the court that what he said during the October 8, 2009 incident "has really

4    not been in much dispute."  When the court asked if he agreed that he used abusive

5    language, Mr. Haynes conceded that he had said, "I should have knocked the shit out of

6    you earlier" to Mr. Zaheer; that he had told Mr. Zaheer that he should "grow the fuck up"

7    and "shut the fuck up;" and that he "may have" called Mr. Zaheer a "little fuckhead."

8    However, he insisted that he "made no threats" against Mr. Zaheer.

9          As for whether he called Mr. Zaheer "a bitch," "a little bitch," or "a goddamn bitch,"

10   Mr. Haynes asserted that he did not call Mr. Zaheer a "bitch," although he "could have" said

11   "goddamn bitch" in reference to "the whole process" because he was "frustrated" by Mr.

12   Zaheer's repeated interruptions.

13         2.      Codelle Phillimore

14         Ms. Phillimore testified that she was at the U.S. District Court on October 8, 2009.

15   She had come to the courthouse with her daughter, who was trying to get a ticket reduced.

16   She was sitting on a bench outside the courtroom her daughter was in, which was in the

17   same area of the courthouse as Judge James' courtroom.

18         Ms. Phillimore remained seated during the entire incident.  She was approximately

19   15 feet away from Mr. Haynes.  She testified that when she first saw Mr. Haynes, he was

20   yelling at Mr. Zaheer, telling Mr. Zaheer that "he would kick his ass, that he was a fuck, that

21   he was an ass, that he was a bitch, and he was a little bitch;" and that while he was doing

22   that, he was leaning into Mr. Zaheer and "trying to make him feel very bad."  According to

23   Ms. Phillimore, while Mr. Haynes was doing this, he was very close to Mr. Zaheer – "close

24   enough to kiss him."  Ms. Phillimore stated that she was frightened for Mr. Zaheer.

25         At some point Ms. Phillimore noted that law enforcement officers arrived.  She first

26   saw two uniformed officers arrive, and then a third officer wearing a blazer.  She testified

27   that Mr. Haynes kept yelling at the officers, who were trying to defuse the situation.

28   According to Ms. Phillimore, the officers tried to quiet Mr. Haynes down, but he kept yelling.

**United States District Court**

For the Northern District of California

1    As Ms. Phillimore left the area outside the courtroom, she went over to Mr. Zaheer.

2    She testified that she gave him her telephone number and told him that if he needed any

3    information about what had happened that day, she would be willing to be a witness.

4        3.    Dirk Larsen

5    Mr. Larsen testified that when Mr. Haynes was initially standing up talking to Mr.

6    Zaheer, they were 10-15 feet away from the courtroom door.  Mr. Larsen did not have any

7    recollection of Mr. Zaheer interrupting Mr. Haynes, although he did recall Mr. Haynes telling

8    Mr. Zaheer to stop interrupting, and also recalled Mr. Haynes using "threatening, abusive,

9    profane language."  He did not recall Mr. Zaheer saying he would continue to interrupt Mr.

10   Haynes.

11   He testified that Mr. Haynes subsequently "walked into" Mr. Zaheer or "walked at

12   him making threatening and profane and abusive remarks to him," and "backed him

13   towards the courtroom."  Mr. Larsen stated that Mr. Haynes kept following Mr. Zaheer, and

14   was "in his face" – three to six inches away, with his body "very close" to Mr. Zaheer's body

15   – and "continued to hurl verbal abuse at him."  Mr. Larsen's impression – based on Mr.

16   Haynes' words and actions – was that Mr. Haynes was going to strike Mr. Zaheer.

17   In responding to Mr. Haynes' questions during the direct examination, Mr. Larsen

18   stated, "You were moving towards him rapidly.  It was a walking pace, but a rapid walk.

19   You were trying to loom over him.  You were saying threatening words to him, swearing

20   incessantly, and it wasn't just swearing, but it was physically belittling[,] the sorts of terms

21   you were using to him and things like, I will show you. . . . In my view, you were showing

22   him that you were physically going to dominate him."  According to Mr. Larsen, the terms

23   Mr. Haynes was directing at Mr. Zaheer included "little bitch" and "little punk."  Mr. Larsen

24   considered this to be an assault.

25   Mr. Larsen did not specifically recall Mr. Zaheer saying he was going to go get a

26   marshal, but he "figured that is what would probably be happening."  After Mr. Zaheer went

27   into the courtroom, Mr. Larsen and Mr. Haynes continued talking until the officers arrived.

28   Mr. Larsen deliberately did not leave, because he assumed some law enforcement

United States District Court

For the Northern District of California

1   personnel would be arriving.

2       Mr. Larsen also recalled, however, that he positioned himself in such a way that if

3   Mr. Haynes became angry again, he (Mr. Larsen) would have an "escape route," but also

4   so that if Mr. Haynes left before the officers arrived, he (Mr. Larsen) would be able to see

5   where he went and tell the officers.  He recalled that he was "focused on trying to keep

6   calm and say things in a calm way" so that Mr. Haynes wouldn't assault him.

7       Mr. Larsen recalled that Mr. Haynes used abusive language towards the officers as

8   well as towards Mr. Zaheer.

9       4.    Christian Hanson

10      Christian Hanson is employed by the United States Marshal Service, as a

11  Supervisory Deputy U.S. Marshal.  On October 8, 2009, Deputy Hanson was approached

12  by Judge James' courtroom deputy, Ms. Tolbert, who was accompanied by Mr. Zaheer.

13  According to Deputy Hanson, Mr. Zaheer indicated that he needed to talk to a Deputy

14  Marshal because he had just been assaulted by another attorney named Mr. Haynes, and

15  that he had been assaulted verbally and that Mr. Haynes had threatened him.

16      At that point, Deputy Hanson asked his co-worker to contact the court security officer

17  and FPS.  He then asked Mr. Zaheer to provide a business card, or some type of

18  identification.  Deputy Hanson testified that Mr. Haynes stated he didn't have a business

19  card, but that he did provide his driver's license.  It was Deputy Hanson's impression that

20  Mr. Haynes was intending to leave the 15th floor.  Deputy Hanson requested that Mr.

21  Haynes remain.

22      Deputy Hanson described Mr. Haynes as "reluctant to cooperate," and stated that he

23  asked why he was being detained, who Deputy Hanson was, and what his authority was to

24  detain him.  Deputy Hanson showed Mr. Haynes his identification, and explained that it was

25  his responsibility as a U.S. Marshal to detain Mr. Haynes until the allegations of assault

26  were investigated by FPS.  To that, Mr. Haynes responded, "This is bullshit."

27      Deputy Hanson also testified that he observed Mr. Haynes telling Mr. Zaheer that he

28  was "childish" and needed to grow up.  More specifically, Mr. Haynes said "Fuck" several

United States District Court

For the Northern District of California

1   times in a raised voice, towards everyone, including Deputy Hanson, Mr. Zaheer, and the

2   FPS officers (including directing a "Fuck you" at the FPS officer who was interviewing him

3   regarding the incident).

4         At some point Deputy Hanson separated Mr. Haynes and Mr. Zaheer, asking Mr.

5   Zaheer to stay at a bench in the main hallway, and asking Mr. Haynes to stand around the

6   corner.  The FPS officers took statements from both Mr. Haynes and Mr. Zaheer, and then

7   escorted Mr. Haynes from the building.

8   F.      Responses to Testimony at Evidentiary Hearing

9         At the conclusion of the hearing, the court advised Mr. Haynes that he would have

10  30 days to submit his opposition to the Committee's summary judgment motion after the

11  court had provided "either the answer as to whether or not there are any [witness] reports

12  of Mr. Zaheer and Mr. Larsen, or to receive those reports, or notice that there aren't such

13  reports."

14        Eight days later, on October 24, 2012, Mr. Haynes filed an unsolicited "Statement

15  Regarding Hearing," plus a declaration (including numerous exhibits) in support of the

16  statement, in which he made various arguments regarding some matters that were the

17  subject of testimony at the hearing, and some that were not.

18        For example, he argued that he did not use any profanity while he was standing

19  "during the alleged assault" of Mr. Zaheer, and that he remained at least an "arm length"

20  from Mr. Zaheer.  As for matters not raised at the hearing, he asserted that it was improper

21  for the court to include a reference to the dismissal of the <u>Landry</u> appeal in the July 6, 2012

22  order, because that issue was not raised in the petition; and also claimed that it was

23  impossible for Ms. Phillimore to have seen the alleged assault if she was sitting on the

24  bench near the elevator.[1]

25        Mr. Haynes also requested additional time to oppose the summary judgment motion,

26

27  _____

28      [1]  Ms. Phillimore testified she was sitting on a bench outside one of the courtrooms –
    there was no mention of her sitting near the elevator.

United States District Court

For the Northern District of California

1  based on his asserted need for additional discovery.  Further, he demanded that the

2  petition be dismissed, and that the Committee be ordered to communicate with the Ninth

3  Circuit concerning various matters relating to this proceeding.

4      On October 29, 2012, the Committed filed a response to Mr. Haynes' October 24,

5  2012 statement, in which it opposed his various requests for relief.  In the same response,

6  the Committee also noted that it appeared that Mr. Haynes was intending to oppose the

7  summary judgment motion largely on the basis that he has previously been disciplined for

8  all the matters raised by the Committee.

9      The Committee argued that the court has the authority to impose discipline on the

10  basis of conduct previously sanctioned, particularly where patterns of prior behavior

11  indicate that the attorney may not be able to conform his conduct to expected professional

12  norms in the future, although it also has discretion to decline to consider such conduct.  In

13  support, the Committee cited Sacher v. Association of the Bar of the City of New York, 347

14  U.S. 388, 391 (1954); In re Jaffe, 585 F.3d  118, 120-21 (2nd Cir. 2009); and Standard 9.22

15  of the American Bar Association's Standards for Imposing Lawyer Sanctions, and noted

16  that the reasoning is that disbarment is designed to protect the public, and is not primarily

17  designed to punish the attorney.

18      On November 2, 2012, the court reporter posted the transcript of the October 16,

19  2012 hearing on the docket for this case.

20      Also on November 2, 2012, Mr. Haynes submitted a six-page letter to the court,

21  asserting that during his visit to the clerk's office on October 24, 2012 to file his "Statement"

22  regarding the hearing, he had read an article about the hearing that had been published in

23  the Recorder legal newspaper.

24      Among other things, Mr. Haynes argued that based on this article, the court should

25  allow him to take discovery regarding the "basis for the prosecution and referral" of this

26  case and regarding other discipline cases the Committee has investigated and prosecuted;

27  should dismiss the petition; should issue an order to show cause why the Committee

28  should not be sanctioned for making false statements; and should inquire into whether the

34

1   Committee or the San Francisco City Attorney's Office had improperly influenced the author

2   of the article.

3        Mr. Haynes also complained that he had not been given an opportunity to address

4   any of the issues in the article, and claimed that the reporter never asked him for

5   comments, and asserted that the court should "require the reporter to explain why she

6   failed to contact" him.

7        Finally, Mr. Haynes asserted that the only reason he had requested that the case be

8   unsealed was that the Committee had "violated the rules" in sending the petition and

9   summary judgment motion to the wrong address, had given "unauthorized persons" copies

10  of sealed documents, and had failed to send documents to him by e-mail as ordered by the

11  court.

12       On November 8, 2012, in response to filings by the parties, the court issued an order

13  noting that the Committee had filed a notice on October 22, 2012 stating that it had

14  contacted FPS through the office of the U.S. Attorney, and that FPS had indicated that it

15  had no documents reflecting witness statements concerning the October 8, 2009 incident

16  other than the reports that were already in the record, and that there was no video

17  recording of the incident.  The court set a December 10, 2012 deadline for Mr. Haynes to

18  respond to the Committee's summary judgment motion, and a December 24, 2012 due

19  date for the reply brief.

20  G.    The Opposition to the Motion for Summary Judgment[2]

21       On December 10, 2012, Mr. Haynes filed a 37-page opposition to the Committee's

22  motion, along with a declaration and attached exhibit consisting of a number of e-mails

23  between himself and opposing counsel, and between himself and Ms. Cotterill.  On

24  December 11, 2012, he filed a second declaration, accompanied by a number of exhibits.

25       Mr. Haynes began by arguing that he needed additional time to respond, because

26

27       [2]  In setting forth the substance of Mr. Haynes' opposition to the summary judgment
28  motion, the court includes extensive verbatim quotes from his papers, as the court found it
    impossible to summarize many of his arguments.

United States District Court
For the Northern District of California

(1) the issues involved are not clear[;] (2) issues take a great deal of time[;]
(3) the court testimony was recently obtained and time is needed for to [sic]
review that [sic] [;] (4) respondent had lost the flash drive that contained most
of information and filings in this matter and such information is not
immediately available to him; (5) other matters and limited income due to
having to respond to this lawsuit and not taking a case due to the uncertainty
of the outcome of this case, thereby making the opposition to the matter more
difficult; (6) the unclear nature of the proceeding and what issues are to be
presented, including law and motion matters.

He requested a 30-day extension, and also requested "a management conference

will [sic] the issues can be determined and the standard the court is using[,]" adding that "[i]t

is unclear, for example, what this summary judgment motion is."  Following this introductory

argument, he proceeded with his opposition.

The opposition is rambling, unfocused, and generally incoherent.  As an initial

matter, Mr. Haynes asserts that the Committee has failed to establish that any discipline is

warranted.  First, he argues that "the declarations in this matter" (presumably referring to

declarations by Mr. Pratt, Mr. Zaheer, Mr. Larsen, and Ms. Cotterill filed on June 1, 2011, in

support of the Committee's original motion for summary judgment) are "vague statements

which upon inspection have no substance and clearly do not call for sanctions."  He does

not support this assertion with reference to specific declarations.

Second, Mr. Haynes contends that Rule of Professional Conduct 3-500 requires only

that the attorney comply with "requests for information and copies of significant documents

when necessary to keep the client so informed."  He claims that because Ms. Cotterill was

an "experienced paralegal" and was a law student at the time of the October 8, 2009

incident, it was unnecessary for him to inform her about the result of the summary judgment

decision.

Third, Mr. Haynes argues that "the statute upon which petitioner is proceeding to

impose discipline" (evidently referring to Local Rule 11) is unconstitutional both facially and

as applied.  He also claims that "the statute" is vague and ambiguous regarding "the notice

needed for the referral."  He asserts that in this case, the Committee never provided written

notice as to "[t]he charges respondent faced or verbal identification of the issues to be

addressed," and that "it is unclear as to what the charges are, even at the summary

36

United States District Court
For the Northern District of California

1    judgment stage[.]"

2         Fourth, Mr. Haynes argues that the "statute" is "unreasonable" because it requires

3    that the case be appealed to three judges of this court, and argues that "[i]t should allow for

4    direct appeal to the Ninth Circuit."  He also contends that the case involves "so many

5    judges" in this district that it becomes unfair to him.

6         Fifth, Mr. Haynes claims that the "statute" is vague and ambiguous regarding "the

7    procedure to be filed."  He notes that the local rules provide that the case will proceed like

8    any other case, and asserts that he is therefore entitled to a "jury trial, discovery, case

9    management conference, etc."

10        Sixth, Mr. Haynes contends that the case has been "unclear" because no discovery

11   has been allowed; because the court ordered a hearing without any prior discovery;

12   because witnesses were not present "such as officer involved with Haynes;" because the

13   court did not allow sufficient time to cross-examine "where it represents the first time to

14   interview witness [sic];" because the nature of the hearing was "unclear;" because the

15   motion for summary judgment was "filed without notice," and the motion was renoticed

16   "without discovery;" because "claims or defenses [were] not allowed and not [sic] discovery

17   permitted as to them;" and because "prior determination without opposition that issues or

18   facts are undisputed, etc."

19        Seventh, he argues that there is "[n]o guidance as to the basis for discipline and the

20   filing of the petition," and that "motive is improper, as it is based on race and objection to

21   procedure, and is arbitrary."  He notes that there are "only a very few cases" filed by the

22   Committee, and again complains that he has had "no discovery allowed in this matter on

23   many subjects, and very limited on others as the hearing may have been discovery,

24   however it is unclear as it is unclear what the hearing was."  In addition, he asserts that "the

25   institution of the petition allows for bias as the members of the committee has [sic] strong

26   ties to the Office of the City Attonrey [sic] which is seeking the action."

27        He includes a long list of "[c]ondcut [sic] that reflects a bias and unfair action," such

28   as "filing action as to client who are who have not complained about conduct;" encouraging

United States District Court
For the Northern District of California

1   parties to file declarations by duress; obtaining false or misleading declarations "by duress

2   and interview or investigation in matter that encourages false or misleading information;"

3   knowing that false statements would be used in a proceeding with no opposition;

4   unreasonable conduct such as advising the court that respondent's email address is

5   unknown when it [sic] has sent several emails," not granting extensions of time; and so

6   forth.  However, he does not provide much explanation of these actions, and most of the

7   references are not comprehensible.

8        Eighth, he again argues that he needs more time to oppose the motion and obtain

9   additional discovery, and repeats that he is "unclear as to the issues to be addressed."  He

10  also claims that his "information regarding this matter" was on a flash drive, which could not

11  be located as of November 30, 2012; and that he does not have "immediate access to

12  information needed" to respond to the motion.

13       Ninth, he argues that "[t]he incidents are isolated events, and his actions were not

14  intentional and "involved stress circumstances."  For example, he asserts, "Mr. [sic] Cotterill

15  would not communicate with respondent."  Nevertheless, he contends, "[a]ll his actions

16  were designed to help her."  He now claims that he filed the notice of appeal because he

17  feared that the instructions not to file it did not come from Ms. Cotterill.  And, he asserts, he

18  returned her file "promptly" upon her response to his May 1, 2010 email.

19       Tenth, as for the charge that he caused harm to clients, Mr. Haynes asserts that he

20  violated no duty to Ms. Cotterill and that she suffered no harm.  He claims that he kept her

21  advised of the developments of the case; that she authorized the filing of the appeal prior to

22  November 2009, and that because of that prior authorization and the actions of her

23  allegedly schizophrenic mother, he decided to go ahead and file the notice of appeal.  He

24  claims she suffered no harm, as "[t]he litigation was successful as it addressed the

25  concerns of Ms. Cotterill and challenged the actions which were unlawfully taken agasint

26  [sic] her."

27       With regard to Marcus Landry and Daniel Landry, Mr. Haynes contends that they

28  suffered no harm as a result of his conduct, and that he "has no further statement on this

United States District Court
For the Northern District of California

1 topic," but that "the litigation was successful." As for the dismissal of their case, Mr.

2 Haynes asserts that that was "due to legal error" on his part – specifically, that because

3 Judge Conti said he was taking over discovery, Mr. Haynes did not think he needed to file

4 an opposition to a discovery motion that had previously been filed before Judge James.

5 He claims that contrary to Judge Conti's order, Mr. Zaheer filed a proposed order

6 with Judge James, and before he (Mr. Haynes) could object, the order was entered.

7 However, he claims, the order "was objectionable and would have been difficult to comply

8 with as ordered." He asserts that Judge Conti then dismissed the case rather than allowing

9 a less harsh penalty, or compliance with a "modified order."

10 As for the dismissal of the appeal by the Ninth Circuit, he claims that this occurred

11 "due to the committee's serving the summary judgment motion on the wrong address." Of

12 course, he adds, "as in all matters," he "takes the responsibility for all action[s]."

13 Eleventh, Mr. Haynes contends that the conduct of Mr. Pratt, Mr. Zaheer, and Ms.

14 Osborn was "rude and offensive." He contends that Judge White ruled that no sanctions

15 were warranted in the "Pratt matter"[3] in which he claims Mr. Pratt "insulted" him in an

16 _____

17 [3] Mr. Haynes' characterization is not entirely accurate. He suggests that Judge White
specifically ruled that no sanctions should be imposed for the comments in the e-mails to Mr.
18 Pratt ("read your fucking email," "fuck you," and "I got no respect for you because you are a
lying bitch").

19 The record shows that on September 18, 2008, the Regents requested to be relieved
20 from the requirement of submitting joint case management conference statements co-authored
by Mr. Haynes, based on the difficulty Mr. Pratt had experienced getting Mr. Haynes to
21 participate (referencing a number of examples of uncooperative behavior on the part of Mr.
Haynes, as well as the inappropriate language in the e-mails).

22 Judge White denied the Regents' request to be relieved from the meet-and-confer
23 requirements for joint submissions, but ordered Mr. Haynes to appear on October 10, 2008 to
show cause why he should not be sanctioned for failure to meet and confer in good faith. He
24 also ordered Mr. Haynes to file a written response no later than October 6, 2008, explaining
why sanctions should not be imposed against him, and responding to the specific allegations
25 of misconduct detailed in the Regents' administrative motion and again in the responsive letter
from counsel for the Regents filed September 29, 2008.

26 On October 6, 2008, Mr. Haynes filed a written response in which he stated, "I have
27 always meet [sic] and conferred in good faith in this matter[,]" and asserting that "[m]any of the
allegations of Mr. Pratt are false or incomplete and therefore to do [sic] reflect the meet and
28 confer conduct of me, plaintiff's counsel." He provided a rambling account of the parties' meet-
and-confer efforts, complained that Mr. Pratt had "yelled" at him during at least one telephone

1    e-mail statement.  He claims that the incidents involving Mr. Zaheer and Ms. Osborn

2    occurred at a time when he (Mr. Haynes) was suffering a "potentially career ending medical

3    problem which caused [sic] him to be unable to speak."  He contends that this condition

4    developed after the incident with Mr. Pratt and specifically after the deposition of "officer

5    Matthew" in the <u>Cotterill</u> matter.

6          Mr. Haynes asserts that this voice problem affected all his cases, including <u>Cotterill</u>

7    and <u>Landry</u>.  He contends that in <u>Landry</u>, the case was continued due to his voice problem,

8    and "the summary judgment motion was effected [sic] by the medical condition."  In the

9    "Zaheer matter," he contends, Mr. Zaheer falsely accused him of assault, in order to

10   "conceal on hitting respondent in the hand."

11         He asserts that Ms. Osborn (presumably in <u>Gillis</u>) falsely accused him of "bringing

12   three clients to the deposition of one of the clients in order to intimidate her."  He contends

13   that when Ms. Osborn made a statement to that effect at a subsequent deposition, he

14   responded that the statement was racist, offensive, and objectionable.

15         He also complains about Ms. Hoeper's letter to Judge Walker, asserting that she

16   _____

17   call and was "not in a rational state," and then suggested that Mr. Pratt had driven him to say
     "read your fucking email" in a phone conversation, and to write "read your fucking email" in an
18   e-mail exchange because he (Mr. Pratt) had failed to read some e-mail but insisted that he had
     read it.  Mr. Haynes also claimed that he had told Mr. Pratt that he had no respect for him
19   "because he misrepresented facts to the court" (though he also attached copies of his e-mails,
     including the one calling Mr. Pratt a "lying bitch").

20         Following the October 10, 2008 hearing, Judge White issued a minute order indicating
21   that the court had "admonished counsel re: appropriate behavior towards each other," and that
     "[n]o sanctions will be imposed at this time."  However, the order also directed that "[c]ounsel
22   shall make an audio record of all meet and confer sessions."  Though no sanctions were
     imposed at that time, there is no indication that Judge White ruled that sanctions were not
23   warranted because of the offensive e-mails.

24         When Judge White did finally award sanctions pursuant to the report and
     recommendation prepared by Judge Larsen, he noted Mr. Haynes' improper and vexatious
25   conduct during the entire case – which included unreasonably proliferating proceedings, failing
     to comply with court orders, raising petty disputes which also needlessly increased the costs
26   of litigation, constantly filing rambling and legally deficient submissions, and engaging in
     unprofessional interactions with opposing counsel.  However, he awarded fees and costs
27   pursuant to 28 U.S.C. § 1927 only for the period after November 5, 2008, based on Mr.
     Haynes' failure to dismiss the case at the point where it became obvious that there was no
28   viable claim.

had never before expressed any concern to him regarding <u>Landry</u> and <u>Gillis</u>.  He contends

that he has litigated numerous cases on behalf of plaintiffs who had filed suit against the

City, and that he had never had any problems prior to that.

Twelfth, he contends that the "allege misrepresent" [sic] to the court is false, adding

that the Committee "uses declaration in response to a letter out of context."  He claims that

he did not mislead the court.

Following the above, which takes up about nine pages of his opposition, Mr. Haynes

devotes an additional 27 pages to a discussion that is divided into four sections – (1) the

"<u>Gillis</u> matter;" (2) the "<u>Cotterill</u> matter;" (3) the "Zaheer matter;" and (4) the "Pratt matter."

1.    The <u>Gillis</u> case

The <u>Gillis</u> case involved allegations of unlawful arrest and search, excessive force,

and violation of due process and equal protection rights, and was filed by three individuals

who had been arrested by San Francisco Police Officers for robbery.

In his discussion of this case and his comment about the "poor little white girl"

mentality, Mr. Haynes asserts that he used that term during the course of the deposition of

one of the plaintiffs to emphasize that the robbery victim was "not in fact a poor little white

girl but was attempting to attract sympathy" by yelling "rape."

He then argues that the only offensive comment made during the deposition was

Ms. Osborn's assertion that he (Mr. Haynes) had brought three convicted felons to the

deposition in an effort to intimidate her.  Mr. Haynes contends that the three convicted

felons were his clients, who had been arrested for robbery, and had every right to be at the

deposition because they were plaintiffs in the case.  He states that he attempted to get Ms.

Osborn to apologize for her comment, which he considered offensive and racist (because

the plaintiffs were African-American), but that she refused.  It was later in the deposition

that he directed the "poor little white girl" comment at Ms. Osborn.

2.    The <u>Cotterill</u> case

Mr. Haynes argues that he did not violate any of his professional or ethical duties to

Ms. Cotterill.  As for whether he kept her informed of the progress of the case, Mr. Haynes

United States District Court
For the Northern District of California

claims that he generally discussed all issues with her.  He complains that the issues of the

late opposition to the motion for summary judgment, and the resulting order to show cause,

were not mentioned in the petition or in the motion for summary judgment,[4] and that he

therefore "did not have notice of these issues."

Mr. Haynes also contends that because Ms. Cotterill had worked as a paralegal and

was at the time of the lawsuit a law student, she was more familiar with the case than a

client without legal training would have been, and "the discussions with regard to the

decisions in [her] case were more detailed and also included future action."  He claims that

"[t]he parties" (possibly referring to himself and Ms. Cotterill) had "no less than 10 face to

face meetings regarding the various decisions," which included "going over cases, including

the cases that Ms. Cotterill thought were proper."

Mr. Haynes does not recall discussing the summary judgment motion with Ms.

Cotterill, but argues that she would have been aware of when "the answer" (the opposition

to the summary judgment motion?) was due and the order to show cause "as these would

all be viewable on the court's website."  Even though he does not recall discussing the

summary judgment motion with Ms. Cotterill, he asserts that he "did not violate a duty to

keep plaintiff timely informed of the result of the summary judgment," and claims that it was

"understood that plaintiff would monitor the case and had," and that it was "understandable

and expected that she would be aware of the summary judgment order."

As for whether he actually advised Ms. Cotterill of the summary judgment ruling, Mr.

Haynes claims that he did (although he also apparently does not recall discussing it).  He

adds, "Indeed, if there was a hearing on the summary judgment motion and the court

denied the motion at the hearing with plaintiff being present, plaintiff would be informed of

the decision."[5]

---

[4] This assertion is not true. Both the petition and the motion mention the late opposition and the order to show cause.

[5] Actually, there was no hearing.  Judge White issued a written decision on October 20, 2009, stating that "[t]he court finds the motion appropriate for decision without oral argument." As indicated above, the order also characterized Mr. Haynes' conduct throughout the

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    With regard to the filing of the notice of appeal, Mr. Haynes asserts that prior to the

2  summary judgment motion, Ms. Cotterill had given him "direct and clear authority" to file an

3  appeal, on several occasions.  This "authorization" was supposedly "verbal," and he claims

4  that the "authorized means of communication was verbal."  Further, he asserts, he "would

5  not accept anything other than verbal authorization from a client and has never accepted

6  anything other than a verbal authorization from a client."

7    Next, Mr. Haynes contends that the authorization to file an appeal "was given at the

8  time the case was first accepted and repeated throughout the litigation including various

9  motions to dismiss and at the settlement conference."  He claims that Ms. Cotterill

10  "understood that the lawsuit was disfavored and that an appeal was likely."  He spends

11  considerable time explaining how and why Ms. Cotterill contacted him and insisted that he

12  represent her, notwithstanding his having advised her that her case was a difficult one.

13    Mr. Haynes asserts that Ms. Cotterill had told him that her mother was opposed to

14  the filing of the lawsuit, and had also told him that her mother suffered from severe

15  schizophrenia, in order to explain her mother's "inconsistent and unusual behavior," such

16  as agreeing to be interviewed and then refusing to be interviewed.  He contends that during

17  the course of the litigation, Ms. Cotterill's mother seemed to become more "supportive" of

18  the case, but that at the settlement conference, "she clearly indicated that she felt the case

19  should be dismissed."

20    With regard to Ms. Cotterill's request to him that he dismiss the appeal, Mr. Haynes

21  concedes that he did receive an e-mail to that effect, but claims that he was unable to

22  "verify" that the e-mail had come from Ms. Cotterill.  He contends that this inability to verify

23  information was "reinforced by the false and confusing statements in the email," such as

24  the statement that he had never informed Ms. Cotterill that costs and attorney's fees might

25  be imposed against her.  He claims that the issue of costs and attorney's fees was clearly

26  discussed before he accepted the case, when the fee agreement was signed, and after the

27  _____

28  prosecution of the case as "reprehensible."

1   lawsuit was filed, including at the settlement conference.

2        Based on these "false and confusing statements," Mr. Haynes decided that it must

3   have been Ms. Cotterill's allegedly schizophrenic mother who sent the e-mail telling him to

4   dismiss the appeal, as the mother "appeared to have sent an email to [him] in the past"

5   from Ms. Cotterill's e-mail account.  Alternatively, it occurred to him that the e-mails (not

6   clear which e-mails exactly) may have been sent "as a result of her [Ms. Cotterill's] learning

7   disability and the related stress of studying for her law school finals."  In addition, he

8   asserts that some e-mails were also copied to the same address – that is, the e-mail would

9   be sent to both himself and Ms. Cotterill.  He surmises that some third party was sending

10  those e-mails and forwarding a copy of what was sent to Ms. Cotterill.  In any event, Mr.

11  Haynes contends that because of these concerns, he sought voice verification by a phone

12  call.  He claims that on November 17 and 19, 2009, and again on December 1, 2009, he

13  asked Ms. Cotterill to call him.

14       Mr. Haynes maintains that Ms. Cotterill and her mother had "a relationship which

15  permitted a reasonable assumption that the mother was sending [the e-mails]."  In support

16  of this assertion, he cites to his own declaration, where he states that Ms. Cotterill had

17  repeatedly indicated that her mother was attempting to run her life, including entering her

18  apartment without her permission; and had become involved with a boyfriend of Ms.

19  Cotterill's.  Mr. Haynes also claims that Ms. Cotterill wrote a letter to an ex-boyfriend in a

20  long-term psychiatric detention facility where she indicated she "had or was about to kill her

21  mother," which "resulted in the police coming to the home to interview the mother and

22  daughter."

23       In addition, Mr. Haynes asserts, Ms. Cotterill's mother had filed various claims of

24  malpractice against doctors who had treated Ms. Cotterill.  He contends that Ms. Cotterill

25  was financially dependent on her mother, and that the two lived in the same apartment

26  building (though in separate apartments).

27       Mr. Haynes continues, asserting that the "psychiatric nature of both the mother and

28  [Ms. Cotterill] became clearer and more troubling" during the deposition of Ms. Cotterill's

United States District Court
For the Northern District of California

44

United States District Court
For the Northern District of California

1   psychiatrist.  Further, Mr. Haynes claims to have spoken with Ms. Cotterill's brother-in-law,

2   who "indicated that the mother did have severe psychiatric conditions which made

3   communication with her difficult and noted that [Ms. Cotterill] had poor judgment, which was

4   reinforced by the psychiatrist's deposition."  In any event, Mr. Haynes claims that if he

5   could have been certain that the e-mail telling him not to file the notice of appeal had

6   originated from Ms. Cotterill and not from her controlling and allegedly schizophrenic

7   mother, he would never have filed the appeal.

8          Finally, with regard to the issue of the return of Ms. Cotterill's file, Mr. Haynes

9   argues, first, that he took "prompt action" to return the file.  He claims that the file included

10  "several boxes of material."  He contends that on May 1, 2009 (he probably means May 1,

11  2010, in view of the sequence of events), he advised Ms. Cotterill that he was "processing"

12  the file for return to her, and would "update her as to the file on May 10, 2010."  In addition,

13  he asserts, part of the file "could not be returned to her as it was part [sic] of a protective

14  order."

15         Mr. Haynes contends that he believed "the primary purpose for returning the file" to

16  Ms. Cotterill was "the handling of the case regarding the recommendation for the imposition

17  of sanctions."  He claims that on May 11, 2009, the court advised that it was <u>not</u> imposing

18  sanctions against Ms. Cotterill, but was imposing sanctions against Mr. Haynes.[6]

19         Mr. Haynes claims that "it is clear" that "the client misrepresented facts to the court

20  regarding the case."  For example, he asserts, she claims that he failed to advise her "of

21  that costs and attorney fees could not be imposed," and that he told her she had a good

22  case.  He argues that this is not true, because he told her it was a difficult case, "which is

23  why she was having great difficulty in obtaining an attorney."

24         Mr. Haynes asserts that once the court had declined to impose sanctions against

25

26  _____

27         [6]  There is no indication in the docket of the <u>Cotterill</u> case of any sanctions being
    imposed or not being imposed in May 2009.  However, it was on May 13, 2010 that Judge
28  White adopted the report and recommendation prepared by Judge Larsen regarding attorney's
    fees and costs, so that may be the order to which Mr. Haynes is referring.

United States District Court
For the Northern District of California

1   Ms. Cotterill and had imposed sanctions against him,[7] he assumed that Ms. Cotterill did not

2   want the file.  He claims that his focus at that point was on defending against the motion for

3   attorney's fees and costs – which in his view would require the file.  He argues that

4   ordinarily, when a client requests the file, "the attorney would be free from the need of the

5   file" – and would just have to decide which client to give the file to, if there were multiple

6   clients.  In this case, however, he claims that <u>he</u> was "a party" and thus, "needed the file."

7        He adds that "[d]ue to the preeoccupation that [he] had in preparing to appeal the

8   case where the file would be needed, [and] the belief [that Ms. Cotterill] did not seek to

9   obtain the file due to having won on the cost and attorney fees claim, [he] did not continue

10  to prepare the file for return and instead concentrated on the appeal."

11       He then asserts that in June 2010, he received the petition in this matter, and that

12  Ms. Cotterill did not state in her declaration that she wanted the file returned.  (The petition

13  was actually filed in October 2010, but because of the problem with service at the correct

14  address, Mr. Haynes was not served immediately.  The actual date of service appears to

15  have been in June 2011.)

16       Nevertheless, Mr. Haynes asserts, he contacted Ms. Cotterill by e-mail in July 2010

17  to determine if she wanted the file, and to ask that if she did want the file, whether he could

18  keep it until after the appeal (of the sanctions order) had been resolved.  He claims that Ms.

19  Cotterill did not respond to this email by August 2012  (possibly he means August 2010?),

20  and he therefore assumed she did not want the file.  He claims he sent another

21  e-mail in August (2010?) to confirm she did not want the file, but received no response.

22  Then, he asserts, on September 22, 2010, he sent Ms. Cotterill another e-mail.  By this

23  time, he had received a letter from the State Bar saying she wanted her file.  He claims that

24  he immediately sent another e-mail telling her that if she had only responded to his prior

25  _____

26       [7]  As indicated above, Judge Larsen recommended that the motion for fees and costs
     under § 1988 be denied, because granting such relief would leave Ms. Cotterill penniless and
27   deter the wrong person (Ms. Cotterill instead of Mr. Haynes); but also recommended that the
     motion under § 1927 be granted, based on Mr. Haynes' bad faith, and reckless, vexatious, and
28   unreasonable conduct, and in particular, his insistence on continuing to litigate the case past
     November 5, 2008, a point at which it had become clear that Ms. Cotterill had no viable claim.

United States District Court

For the Northern District of California

1    e-mails, he would have returned the file.  Then, according to Mr. Haynes, on September

2    22, 2011, Ms. Cotterill sent him an address where she wanted the file sent.

3           Notwithstanding this, Mr. Haynes still had a problem returning the file.  He claims

4    Ms. Cotterill indicated that a messenger could pick it up, but asserts that the file was "over

5    5 boxes" and "in a location other than San Francisco."  He says he called her prior to

6    "attempting to deliver the file to her" but was unable to reach anyone, and "she did not

7    leave a number where she could be reached."  Thus, unable to contact her, he "advised

8    that the file (5 boxes) would be delivered to the address listed in the email," but he then

9    "went to the office and no one was present."  He contacted the building manager, who

10   opened the office door so the boxes could be left there.  He asserts that Ms. Cotterill never

11   called him to tell him she had received the file, even though he left messages asking her to

12   do so.

13          Mr. Haynes' position is that the file was returned to Ms. Cotterill "in a timely manner,"

14   and that "[a]ny delay was due to [her] failure to respond to emails including the emails of

15   May 1, 2010, September 17, 2010, July 17, 2010, and August 17, 2010."  He insists that he

16   "never refused to return the file," and that Ms. Cotterill "failed to keep in contact with [him]"

17   and "did not even provide where to return the file until September 22, 2010."  (Previously he

18   said it was September 22, 2011.)

19          In conclusion, Mr. Haynes opines that

20          [t]he return of the file and the filing of the appeal both relate to an emotional
            unstable person who refused to communicate with people and her attorney:
21          first by not confirming that the email was from her by phone or voice message
            and  then not communicating at all with respondent from May 1, 2010 to
22          September 21, 2011.

23   Indeed, he finds it "noteworthy" that "many of the actions in the underlying lawsuit results

24   [sic] from Ms. Cotterill refusing to communicate with people."  In his view, this "refusal to

25   communicate" is "a symptom of her mental disability, which she uses in a passive

26   agreesive [sic] manner."  He claims that in view of Ms. Cotterill's failure to communicate,

27   the file was actually "produced promptly," and that she "suffered no harm" as a result of his

28   actions.

47

United States District Court
For the Northern District of California

1          3.      Mr. Zaheer

2          Mr. Haynes begins with a description of the letter written by Mr. Zaheer to Judge

3    Conti on October 21, 2009, regarding the October 8, 2009 incident outside Judge James'

4    courtroom, and in which Mr. Zaheer requested, on behalf of the City defendants, that all

5    future depositions in the <u>Landry</u> case be held in the San Francisco federal courthouse.  In

6    the letter, Mr. Zaheer mentions Mr. Haynes' history of vexatious behavior, and his habit of

7    engaging in profane name-calling.

8          Mr. Haynes notes that he filed a declaration in response to that letter, evidently

9    referring to the declaration filed on November 13, 2009.  In that declaration, he asserted

10   that Mr. Zaheer's "allegations" were "without merit," and "lack factual support because each

11   claim can be disproved," and that "[t]he allegations of profane name calling is [sic]

12   disproved as there have no allegation prior to the incident of any profane name calling and

13   there has been none."  He also claimed that Mr. Zaheer's conduct had been "outrageous"

14   throughout the case, that he "yell[ed] over the phone and insults," and at a meet-and-

15   confer conference, he "yelled and repeatedly pointed his finger and papers in [Mr. Haynes']

16   face."  This was followed by his description of the events on October 8, 2009, which he

17   asserted would be supported by the video recording that he believed existed of the

18   incident.[8]

19         In his opposition, Mr. Haynes argues that he has never denied making statements

20   on October 8, 2009 to the effect that Mr. Zaheer should "grow the fuck up" or "shut the fuck

21   up."  However, he thinks it is important to note that while he was standing up talking to Mr.

22   Zaheer, he did not use any profanity (he claims) – all he said was, "Don't interrupt me."  At

23   that point, he contends, Mr. Zaheer said he (Mr. Haynes) had "interfered with" him, and so

24   he (Mr. Zaheer) was going to continue to interrupt Mr. Haynes.  And, according to Mr.

25   Haynes, when he said that, he "japed his hand" (?) and hit Mr. Haynes' hand.  He then said

26   Mr. Haynes had assaulted him and that he was going to get a marshal.

27   _____

28         [8]  FPS subsequently confirmed that there is no video recording of the incident.  The
     cameras in the courthouse are used for monitoring, not for recording.

48

United States District Court

For the Northern District of California

1    Mr. Haynes insists that at no time did he threaten Mr. Zaheer, verbally or otherwise.

2    Anything he "might have said" while he was sitting down was because he was "frustrated"

3    by Mr. Zaheer.  Nevertheless, he does concede that in addition to telling Mr. Zaheer to

4    "grow the fuck up" and "shut the fuck up," he also said Mr. Zaheer was "a little fuckhead,"

5    and told him, "I should have knocked the shit out of you."  Mr. Haynes is "certain," however,

6    that he used no profanity while he was standing up talking to Mr. Zaheer.  He repeats this

7    assertion several times.

8    Mr. Haynes reiterates that any bad language he used was simply the result of his

9    frustration with Mr. Zaheer.  He claims Mr. Zaheer interrupted him three times on October

10   8, 2006 (he probably means 2009).  He found these interruptions particularly difficult

11   because of the problem he was having with his voice, which meant that Mr. Zaheer (whose

12   voice was stronger) was more able to interrupt him.

13   With regard to Mr. Larsen's testimony at the evidentiary hearing, Mr. Haynes first

14   asserts that "from the statements to the marshals," Mr. Larsen did not say what happened.

15   In addition, he contends that Mr. Larsen testified in court that he did not see what Mr.

16   Zaheer did, as he was focused on Mr. Haynes; that he did not see Mr. Haynes brush up

17   against Mr. Zaheer; and that he did not see Mr. Haynes' saliva leave Mr. Haynes' mouth.

18   Mr. Haynes claims that this testimony is consistent with Mr. Zaheer hitting Mr. Haynes as

19   Mr. Haynes claims.

20   Mr. Haynes also contends that Mr. Larsen's statements to the federal officers were

21   "consistent to what a video tape of the incident would show as to the some [sic] of the

22   conduct."  He claims further that "[i]t would not show that [Mr. Haynes] brushed up against

23   Mr. Zaheer," and while it "would show Mr. Zaheer hitting [Mr. Haynes], Mr. Larsen states he

24   did not see what Mr. Zaheer did."

25   In addition, Mr. Haynes argues that certain statements made by Mr. Zaheer were

26   false, such as the statement that Mr. Haynes put a finger in his face, and that these

27   statements were not made "because the tape were [sic] disprove it."  More importantly, he

28   argues, "Mr. Larsen not knowing whether there was a tape, might not want to back a false

United States District Court

For the Northern District of California

1    statement."  Now, however, "they know there is no tape."

2         With regard to Mr. Zaheer's testimony, Mr. Haynes asserts as follows.  First, he

3    claims that in his statement to his employer, Mr. Zaheer stated that Mr. Haynes pointed his

4    hands in the face of Mr. Zaheer and told him to "fuck off."  However, Mr. Haynes claims,

5    Mr. Zaheer did not state this in his testimony, in the police report or to the marshals – "He

6    also does not state that I ever said 'fuck off.'"

7         Second, Mr. Haynes contends that Mr. Zaheer denies that he hit Mr. Haynes, and

8    then first states he put his hands up and then states that he did not.  Mr. Haynes claims

9    that Mr. Zaheer also stated in court testimony that he told Mr. Haynes twice to stop

10   assaulting him, and then said that he was going to get a marshal.

11        However, according to Mr. Haynes, Mr. Zaheer did not tell the marshals at the time

12   of the incident that he had asked Mr. Haynes to "stop assaulting" him; and while the

13   statement was included in the San Francisco Police report, Mr. Zaheer also did not include

14   it in the letter of "October 21,20" (??) or in the declaration submitted to the Committee.

15        Third, Mr. Haynes asserts that Mr. Zaheer claims that he (Mr. Haynes) responded to

16   the statement that Mr. Zaheer was going to get a marshal by saying, "Go, get a fucking

17   marshal."  However, Mr. Haynes claims, Mr. Zaheer "never made that statement before to

18   the marshals or in the police report or in his letter of October 21, 2009."

19        Fourth, Mr. Haynes notes that in Mr. Zaheer's email regarding the October 8, 2009

20   incident, he referred to Mr. Haynes "assaulting" him, but when Mr. Haynes sent a return

21   e-mail inquiring about "the factual basis for the assault," Mr. Zaheer did not respond.  Mr.

22   Haynes then requested the e-mail address of Mr. Zaheer's supervisors, but Mr. Zaheer

23   again did not respond.  Mr. Haynes concludes that the allegation of assault is "without a

24   basis," and repeats some of what he previously argued, above.

25        Fifth, Mr. Haynes argues that the statement in the declarations submitted by Mr.

26   Larsen and Mr. Zaheer – to the effect that the discussion in the hallway outside the

27   courtroom concerned the scheduling of depositions – is false, as the scheduling of

28   depositions was done by e-mail.  According to Mr. Haynes, what he and Mr. Zaheer

United States District Court

For the Northern District of California

1   discussed was document production and "maybe accepted the date of the deposition for

2   his witness."  Following this, he and Mr. Larsen discussed what Mr. Larsen's "most

3   knowledgeable witnesses would address as set forth in the deposition notice."  Mr. Haynes

4   describes this as a follow-up conversation to an earlier conversation.

5        Mr. Haynes asserts that Mr. Zaheer signed a declaration on December 17, 2010

6   saying that counsel were discussing discovery matters, and on May 31, 2011, he signed a

7   declaration saying they were discussing deposition scheduling.  Then, he contends, at

8   court (presumably referring to the October 2012 evidentiary hearing), Mr. Zaheer stated

9   that he did not know whether they were discussing deposition scheduling.  Mr. Larsen,

10  according to Mr. Haynes, signed a declaration on May 31, 2009 saying the parties were

11  discussing deposition scheduling.  Mr. Hayes claims that "the facts" show that they were

12  not discussing deposition scheduling.

13       Sixth, with regard to the issue of who interrupted whom, Mr. Haynes notes that

14  neither Mr. Larsen nor Mr. Zaheer stated in his declaration that Mr. Zaheer said he was

15  going to continue to interrupt the conference between Mr. Larsen and Mr. Zaheer; that Mr.

16  Larsen does not indicate why he states that Mr. Haynes became "extremely angry;" and

17  that Mr. Zaheer states only that he was not interrupting, but if he had been, it would have

18  been fair because Mr. Haynes interrupted him.  Mr. Haynes claims that "the implication"

19  was that Mr. Zaheer would continue to interrupt.

20       Seventh, Mr. Haynes contends that while Mr. Larsen and Mr. Zaheer were standing

21  near the elevator before the officers arrived, Mr. Larsen told Mr. Zaheer that he would back

22  him up.  According to Mr. Haynes, this is a "clear indication" that Mr. Larsen intended to

23  give evasive and false information to support Mr. Zaheer.  According to Mr. Haynes, Mr.

24  Larsen did in fact make false and evasive statements, including that the parties were

25  discussing deposition scheduling, and that Mr. Larsen could not recall what Mr. Zaheer did

26  or said.  Mr. Haynes also claims that Mr. Larsen provided "no description of what the

27  parties did physically."

28       Mr. Haynes also finds it significant that Mr. Larsen and Mr. Zaheer "talked about the

United States District Court

For the Northern District of California

1    incident immediately after the incident;" that Mr. Zaheer included in his statement

2    something Mr. Larsen told him (that "Mr. Larsen put his hand on Mr. Haynes' shoulder");

3    that Mr. Larsen states that Mr. Haynes "used terms which no one else has including . . .

4    'little bitch' and 'little punk;'" that Mr. Larsen claims that Mr. Haynes "backed Mr. Zaheer

5    from the bench where the party [sic] were talking, all the way to the door of the courtroom"

6    – which Mr. Haynes asserts would be more than 25 feet; that Mr. Larsen states that he and

7    Mr. Zaheer were walking backwards as Mr. Haynes was advancing on Mr. Zaheer, and that

8    Mr. Haynes was "inches away" from Mr. Zaheer; that Ms. Tolbert "testified" that Mr. Haynes

9    and Mr. Larsen were not outside her door when she exited the [court]room with Mr. Zaheer;

10   and that "he" (Mr. Larsen?) also states that he told the officers that he told Mr. Haynes to

11   "stop" and "knock it off."

12         Eighth, Mr. Haynes asserts that he believed that Mr. Larsen would provide

13   misleading statements in support of Mr. Zaheer, due to (Mr. Larsen's?) false representation

14   at a deposition.  He then goes on to describe an incident that supposedly occurred at the

15   "deposition of Landry," when Mr. Landry "flicked" a document to one side; Mr. Zaheer then

16   "flicked" the document "at the client" (Mr. Landry?); Mr. Haynes told Mr. Zaheer not to

17   "throw" the exhibits "at the client;" Mr. Zaheer denied throwing documents "at the witness"

18   (not clear whether "client" and "witness" are the same); Mr. Larsen then agreed with Mr.

19   Zaheer; Mr. Landry then stated, "Of course, you are going to deny it;" Mr. Zaheer said

20   "[T]he witness flicked the exhibits at me;" the witness (Mr. Landry?) said, "I flicked it to the

21   side, I didn't flick it at you;" Mr. Haynes said, "You flicked it back at him, Counsel;" and the

22   witness (Mr. Landry?) said, "If I would have flicked it at you, you would have touched it."

23         Mr. Haynes claims that while it was clear that Mr. Zaheer had "thrown the document

24   at the deponent," Mr. Zaheer denied it and Mr. Larsen backed him up at the deposition.

25   Later, according to Mr. Haynes, Mr. Zaheer claimed in a subsequent filing that Mr. Landry

26   had thrown an exhibit off the table while exclaiming, "Get that out of my face;" and that

27   when he (Mr. Zaheer) picked up the document and placed it in front of Mr. Landry, Mr.

28   Haynes falsely accused Mr. Zaheer of flicking it at Mr. Landry.

United States District Court

For the Northern District of California

1    According to Mr. Haynes, "this" is false.  He claims that Mr. Larsen was not aware of

2    Mr. Zaheer's explanation and therefore did not know how to back him up – thus, in court,

3    Mr. Larsen said he could not recall.  Mr. Haynes contends that the document was not

4    thrown off the table and Mr. Landry did not throw the document at Mr. Zaheer.  Mr. Haynes'

5    point here is that "Mr. Larsen would support the false statement of Mr. Zaheer" and that Mr.

6    Haynes was aware of this fact.

7    Ninth, Mr. Haynes claims that he did not tell the marshals that Mr. Zaheer hit his

8    hand because he believed that Mr. Zaheer would have said that Mr. Haynes hit Mr. Zaheer

9    and Mr. Larsen would have agreed.  He claims that if "this" (Mr. Haynes hitting Mr.

10   Zaheer?) had occurred, "there would be a case" against Mr. Haynes for assault or battery,

11   and he could have been arrested.

12   According to Mr. Haynes, Mr. Zaheer's motivation for alleging assault "may have

13   been related to keeping his job."  According to Mr. Haynes, Mr. Zaheer "had previously hit

14   plaintiff's client" (Mr. Landry??) at the deposition and his hitting Mr. Haynes on October 8,

15   2009 "may have caused his employer to take disciplinary action" against him.

16       4.    Mr. Pratt

17   In the final section, Mr. Haynes discusses "the Pratt matter."  This is a reference to

18   the offensive e-mails he sent Mr. Pratt in the Cotterill case.  Mr. Haynes believes it is

19   significant that this issue involves only two e-mails that he asserts were sent within minutes

20   of each other.  Following is his description of the e-mails:

21
22   > The first one was he had bitched about not receiving emails and failed to read
     > his fucking emails and then lied  to the court about it.  So if you decided to
     > use email, read you [sic] fucking email.  The second one included "Fuck You"
23   > and I have no respect for you because you are a lying bitch"  It respondent
     > [sic] to his email when he said respondent had no respect for the legal
24   > process.  The email was followed by each side should kept [sic] respondent
     > and Pratt should keep their opinions about each other to themselves.
25
     Opp. at 36 (emphasis in original).
26
27   Mr. Haynes reiterates that prior to this incident, there had been no similar e-mails,

28   and afterwards, there were no such e-mails or such language used.  In addition, he

United States District Court

For the Northern District of California

1   asserts, prior to these e-mails, he had "never used such rude language in any writing."

2   Moreover, he claims, Mr. Pratt had used "rude" language with regard to Mr. Haynes

3   (possibly a reference to the statement that Mr. Haynes' has little respect for the profession

4   and legal process).

5          Mr. Haynes claims he has taken or defended more than 15 depositions with Mr.

6   Pratt in attendance, including one in New York and one in Los Angeles, with no such

7   problems "since the email and all prior the Ms. Hoepper [sic] letter of Feb 2010."  Thus, he

8   asserts, there is no basis for disciplinary action and "no rules were violated."  Indeed, he

9   contends, Judge White has already ruled that no sanctions are warranted, and that the

10  conduct of both counsel was inappropriate.

11         5.     Conclusion

12         Mr. Haynes winds up his opposition with an argument that the court should deny

13  summary judgment because there are material facts in dispute; because the facts and

14  allegations in the petition do not support discipline in this matter; because no assault

15  occurred and "the limitation due to the vocal cord problem" was a "factor in the frustration"

16  Mr. Haynes experienced on account of Mr. Zaheer's "repeated, intentional interruption."  He

17  also contends that "Zaheer, Osborn, and Pratt" were "isolated matters over a 25 years [sic]

18  span," and these incidents are not typical of his behavior over that entire period.

19         With regard to Ms. Cotterill, Mr. Haynes claims the issue concerning the appeal "was

20  solely to protect her interests and to verify that the instructions were from her and not her

21  mother."  He asserts that if Ms. Cotterill had only returned his phone call, he would never

22  have filed the notice of appeal.  The problem with the return of the client file was also

23  caused by Ms. Cotterill, because she failed to return "emails and communication."  He

24  asserts that "there was a problem with the underlying action – non communication – and it

25  was agreed she would call."

26         As for the alleged failure to keep Ms. Cotterill apprised of developments in the case,

27  Mr. Haynes contends that because Ms. Cotterill had a "professional paralegal service," she

28  was "active in the case from the beginning" and was well-informed about developments on

1    the case, particularly those that were viewable on the court's website.  Thus, she was not

2    harmed by any of his actions.

3        With regard to the Landry case, Mr. Haynes contends that it involved "a reasonable

4    mistake, both at the trial level and on appeal due to issues involved in the current action."

5    Thus, he argues, it was "clearly an isolated and unique circumstance."

6        For these reasons, he argues, the Committee's motion should be denied, and the

7    court should dismiss the entire matter on its own motion.

8    H.    The Reply to the Opposition

9        In its reply, which was filed on December 18, 2012, the Committee makes three

10   main arguments.  First, the Committee asserts that the court's disciplinary process is

11   constitutional.  The due process standards applicable to an attorney discipline proceeding

12   require notice and an opportunity to be heard.  In re Corrinet, 645 F.3d 1141, 1145 (9th Cir.

13   2011).  The Committee contends that the court's Local Rules satisfy those requirements,

14   and argues that the procedure afforded Mr. Haynes in this case has gone well beyond what

15   is required.

16       The Committee asserts that notice is provided by the issuance of an order to show

17   cause before the attorney is even required to respond.  Here, the Committee argues, the

18   order to show cause provided notice to Mr. Haynes of the conduct and potential discipline,

19   which was set forth in detail in the petition.  Then, the Committee contends, the court

20   provided Mr. Haynes with even more notice by directing the Committee to file a summary

21   judgment motion.

22       Based on this, the Committee contends that Mr. Haynes was provided with notice of

23   the conduct at issue, as well as evidence of that conduct, and he was given numerous

24   opportunities to respond – his response to the order to show cause, his opportunity to

25   respond at the hearing on the order to show cause, his filing of the Rule 56(d) affidavit, his

26   opportunity to cross-examine witnesses at the evidentiary hearing and to communicate with

27   the court at that time, and his actual opposition to the summary judgment motion.

28       The Committee notes that Mr. Haynes was allowed to request discovery.  However,

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    after finding that the only disputed issues that required an evidentiary showing were those

2    connected to the October 8, 2009 incident, the court determined that given the nature of

3    the claims against Mr. Haynes, he could not be permitted to depose the witnesses outside

4    of the court's presence, and thus ordered that an evidentiary hearing be held at which time

5    Mr. Haynes could examine and cross-examine witnesses.

6        In its second main argument, the Committee contends that the undisputed evidence

7    demonstrates that Mr. Haynes violated his duties as a member of the bar of the Northern

8    District of California.  The Committee asserts that Mr. Haynes violated his duties to his

9    clients in that he failed to notify Ms. Cotterill that summary judgment had been granted to

10   the defendants in her suit; filed a notice of appeal notwithstanding a direct instruction to the

11   contrary from his client; delayed more than 18 months in returning Ms. Cotterill's file to her

12   after she requested it in writing, and did not return it until the failure to do so was raised as

13   a ground for imposing discipline in this case; failed to serve discovery responses in <u>Landry</u>,

14   with the result that the court imposed terminating sanctions; failed to file a brief on behalf of

15   his clients in the <u>Landry</u> appeal, with the result that the appeal was dismissed for failure to

16   prosecute after his eighth request for an extension was denied; and, on numerous

17   occasions, failed to file briefs or provide discovery responses in accordance with the time

18   limits imposed by the Federal Rules of Civil Procedure and/or the Civil Local Rules.

19       The Committee contends that Mr. Haynes' attempts to explain his conduct do

20   nothing to diminish its wrongfulness, and instead suggest that he views his professional

21   duties as discretionary.  For example, the Committee argues that Mr. Haynes' claim that it

22   was unnecessary for him to keep Ms. Cotterill advised about the progress of her case

23   because she was a law student and paralegal is plainly at odds with California Rule of

24   Professional Conduct 3-500, which requires that

25

26       [a] member shall keep a client reasonably informed about significant
         developments relating to the employment or representation, including
         promptly complying with reasonable requests for information and copies of
27       significant documents when necessary to keep the client so informed.

28   Cal. R. Prof. Cond. 3-500 (emphasis added).

1    Similarly, the Committee asserts, Mr. Haynes' claim that he limited Ms. Cotterill's

2   ability to give him instructions on the conduct of the case to verbal communications, and

3   that he was therefore justified in failing to comply with her clear written instruction not to file

4   a notice of appeal, is unsupported by any rule allowing him to ignore a clear client directive

5   if it comes in some form other than his preferred form.  Moreover, the Committee notes,

6   even if Mr. Haynes' current explanation is true, he did not tell Ms. Cotterill in any of the

7   e-mails he sent regarding the filing of the notice of appeal that he would accept only verbal

8   instructions, or that he suspected that she was not the person who was sending the

9   e-mails – indeed, he acknowledged in one of his e-mails that he understood that she did

10   not want to file a notice of appeal.

11    As for Mr. Haynes' claim that the <u>Landry</u> litigation – in which the district court issued

12   terminating sanctions because of Mr. Haynes' failure to comply with court orders and to

13   cooperate with discovery, and the Ninth Circuit dismissed the appeal after Mr. Haynes

14   failed to file the opening brief notwithstanding having received six continuances – was

15   "successful," the Committee contends that it is difficult to conceive of any proper purpose of

16   that litigation that could have been achieved for Mr. Haynes' clients, given the outcome.

17    The Committee also argues that Mr. Haynes violated his duty to be truthful in his

18   communications with the court, as the undisputed facts show that Mr. Haynes misled the

19   court with regard to the October 8, 2009 incident outside Judge James' courtroom.  The

20   Committee refers to the declaration Mr. Haynes filed in the <u>Landry</u> case on November 13,

21   2009, stating under penalty of perjury that there had been no prior allegations of profane

22   name calling; and that he did not lose his composure, did not cause a disturbance, and was

23   not angry at Mr. Zaheer during the October 8, 2009 incident.  The Committee also

24   contends that in Mr. Haynes' account of the incident, he omitted any reference to his

25   having yelled, his having used profane and abusive language, and his having behaved in

26   an aggressive manner towards Mr. Zaheer.

27    Nevertheless, the Committee notes, Mr. Haynes conceded at the evidentiary hearing

28   that he did call Mr. Zaheer profane names during the October 8, 2009 incident, but

United States District Court
For the Northern District of California

1   attempts to argue that his prior statement regarding profane name-calling was a reference

2   to the "several occasions" alleged by Mr. Zaheer.  The Committee contends that  the

3   October 8, 2009 incident was included in the "several occasions," and that Mr. Haynes'

4   claim that the allegations that he had engaged in profane name-calling were "disproved" is

5   plainly false.

6       As for whether he was "angry" with Mr. Zaheer or lost his "composure," the

7   Committee notes that Mr. Haynes now attempts to argue that he was simply "frustrated"

8   by Mr. Zaheer's interruptions – although he also concedes that he told Mr. Zaheer that he

9   "should have knocked the shit out of him" earlier.  The Committee asserts that every

10  witness who testified described Mr. Haynes as yelling and using profanity during the

11  incident, and that the account previously provided to the court by Mr. Haynes in his

12  declaration was completely misleading.  In addition, the Committee argues, the fact that

13  court security officers were called to the scene indicates that Mr. Haynes created a

14  disturbance.

15      The Committee asserts that Mr. Haynes has not practiced in the Northern District

16  with the honesty, care, and decorum required for the fair and efficient administration of

17  justice, as he has made false statements to the court, and his lack of care has required the

18  court and his adversaries to engage in frequent ancillary proceedings to address his

19  deficient practices.  The Committee argues that his lack of decorum is most strikingly

20  demonstrated by his behavior during the October 8, 2009 incident, as it reflects behavior

21  that far exceeded mere incivility and extended into the area of physical intimidation.

22      Nor, the Committee contends, is there any dispute of fact with regard to the e-mails

23  Mr. Haynes sent to Mr. Pratt.  While Mr. Haynes attempts to justify the e-mails on the basis

24  that Mr. Pratt was "rude" to him previously, the Committee asserts that this does not justify

25  the abusive language Mr. Haynes used.  Similarly, the Committee argues, Mr. Haynes is

26  unable to identify any disputed facts with regard to his having called Ms. Osborn a "poor

27  little white girl" during a deposition. While he attempts to justify his behavior by claiming that

28  she had said he had brought his clients to the deposition in order to intimidate her, the

United States District Court

For the Northern District of California

1  Committee contends that even if Mr. Haynes' claim is true, such a comment by Ms. Osborn

2  does not justify the derogatory speech employed by Mr. Haynes.

3      Third, the Committee argues that discipline is warranted based on the fact that

4  Mr. Haynes has failed to show contrition or remorse, as it leaves the court unable to

5  determine that he will conform his future conduct to expected professional norms.  The

6  Committee asserts that attorney discipline is not about punishing the offending lawyer, but

7  rather about protecting the public, other attorneys, litigants, the court, and the

8  administration of justice from the behavior of attorneys who do not conduct themselves

9  professionally.

10      The Committee contends that Mr. Haynes has demonstrated, by his conduct in a

11  number of cases, that he cannot be expected to conform his future conduct to professional

12  norms, as he has repeatedly treated his duties to his clients as optional, failed to meet

13  court deadlines, disregarded his discovery obligations, and mistreated opposing counsel

14  and court personnel.  Even in this proceeding, the Committee notes, Mr. Haynes has

15  ignored the court's directions, filed papers that lack any coherent argument, filed

16  documents that are not authorized under the local rules, arrived late for court, raised

17  innumerable irrelevant issues, engaged in baseless delaying tactics, and generally shown

18  contempt for the process.  In many respects, the Committee asserts, his conduct of this

19  litigation resembles that of a pro se litigant, but he is a lawyer.

20                           **DISCUSSION**

21  A.    Legal Standard

22      An attorney being disciplined is entitled to due process, including notice and an

23  opportunity to heard.  In re Corrinet, 645 F.3d at 1145.  The court must, moreover, follow its

24  local rules when imposing discipline.  Id. at 1146.  Federal district courts are vested with

25  authority to establish rules applicable to matters before them.  28 U.S.C. § 2071(a); Fed. R.

26  Civ. P. 83(a).  This authority, while broad, is subject to both substantive and procedural

27  limitations.

28      Local rules must be "consistent with Acts of Congress and rules of practice and

1   procedure prescribed under [28 U.S.C.] section 2072," (i.e., the Federal Rules).  28 U.S.C.

2   § 2071(a); see also Fed. R. Civ. P. 83(a)(1) (local rules "must be consistent with – but not

3   duplicate" federal statutes and rules; must "conform to any uniform numbering system

4   prescribed by the Judicial Conference;" and must be submitted to the Administrative Office

5   of the United States Courts).  In addition, local rules in federal courts must be "consistent

6   with the principles of right and justice."  Frazier v. Heebe, 482 U.S. 641, 645 (1987)

7   (quotation and citation omitted).

8          The grant of rule-making authority under § 2071 and Rule 83 includes the power to

9   establish rules governing counsel appearing before the district court and to sanction

10  attorneys for transgressing those rules.  Zambrano v. City of Tustin, 885 F.2d 1473,

11  1478-79 (9th Cir. 1989).  The courts also have inherent authority to discipline lawyers

12  appearing before them.  Id. at 1478.

13         The Civil Local Rules in the Northern District implement this authority by imposing

14  substantive standards of conduct on attorneys practicing in the district, Civ. L.R. 11-4; and

15  by prescribing various ways in which attorney discipline may be imposed, including by

16  referral to the Committee and proceedings initiated by a petition for an order to show

17  cause, as here, Civ. L.R. 11-6, 11-7.  Accordingly, the court has the authority to impose

18  discipline on members of the bar of this court, including Mr. Haynes.

19         The local rules applicable to attorney discipline were revised by the court, effective

20  July 2, 2012.  The court offered Mr. Haynes the opportunity to elect the version of the rules

21  under which he wished to proceed, but Mr. Haynes was unable or unwilling to do so.

22  Accordingly, as stated in the order issued on August 14, 2012, the court will proceed under

23  the former version of the rules – the version in effect at the time the petition was filed.[9]

24         A primary difference between the two versions of Local Rule 11 is that the old

25  version provides that after a matter has been referred to the Committee, and the court has

26  issued an order to show cause why the respondent attorney should not be disciplined, "the

_____

28         [9]  For ease of reference, a copy of the former version of Local Rule 11 is appended to this order, as it is no longer available on the court's website.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1  matter shall proceed in accordance with the Federal Rules of Civil Procedure and this

2  Court's Civil Rules as to discovery, motion practice, pretrial and trial as in other civil

3  actions."  Appeal of any order of disbarment or suspension from practice of more than one

4  year is reviewable by a panel of three judges of this court designated by the chief judge.

5  Civ. L.R. 11-7(c)(4), (5) (eff. prior to July 2, 2012).

6       By contrast, the new version provides that "[i]n the event the matter cannot be

7  resolved solely based on the petition, the response and the hearing thereon, the Judge

8  may order such additional proceedings as the circumstances of the particular case may

9  warrant."  In addition, appeal is to the Ninth Circuit.  Civ. L.R. 11-6(e)(5) (eff. July 2, 2012).

10 Thus, under the old rule, the federal rules and the local rules apply as to discovery, motion

11 practice, pretrial, and trial, while the new rule does not mandate any particular procedure,

12 leaving it to the discretion of the court.

13      Nevertheless, the court notes that this matter is not typical of cases that proceed

14 under the Federal Rules of Civil Procedure, as it does not involve a plaintiff and a

15 defendant.  While the Committee is not, strictly speaking, a prosecutor, it is also not a party

16 to an adverse proceeding.  It is an official standing committee of the district court, and as

17 such, acts as an arm or an adjunct of the court.  For this reason, the court finds that the

18 standard procedures set forth in the federal rules and the local rules must be somewhat

19 modified to fit the circumstances.

20      The court interprets the reference in Local Rule 11-7(c)(4) to "[r]ules as to discovery"

21 to mean that discovery is permitted, where necessary to either side.  Here, the court

22 allowed Mr. Haynes several opportunities to state what discovery he required and why he

23 believed it was necessary, but found that the bulk of the requested discovery was irrelevant

24 to the issues raised in the petition (which in any event, were largely undisputed).

25      Moreover, as explained in some detail above, the court determined that as to any

26 witnesses with knowledge of relevant facts that were disputed, the court would provide Mr.

27 Haynes an opportunity to examine those witnesses in the deposition-like environment of an

28 evidentiary hearing, which would be supervised by the court because of the allegations of

61

1 misbehavior, and which would also provide the court with an opportunity to evaluate the
2 contested evidence.

3        Ultimately, however, once the evidence was presented, the court concluded that it
4 could resolve the matter without making many credibility determinations – and, as in other
5 civil cases, without the need of a "trial" because much of the evidence is undisputed.
6 Moreover, any "trial" would have been to the court (since there is no right to a jury trial in
7 these proceedings), much like the evidentiary hearing.

8 B.     Findings and Conclusions

9        As set forth in the July 6, 2012 order, and again by the court at the commencement
10 of the October 16, 2012 evidentiary hearing, the issues to be decided in this proceeding
11 are, first, whether Mr. Haynes violated the rules of ethics and professional responsibility
12 with regard to the duties he owed his clients in the <u>Cotterill</u> matter and the <u>Landry</u> matter;
13 second, whether Mr. Haynes violated the rules of ethics and professional responsibility with
14 respect to his behavior towards opposing counsel in those two cases as well as in a third
15 case, the <u>Gillis</u> matter; third, whether Mr. Haynes violated his duty of honesty and candor
16 owed to the court in connection with his representations regarding the October 8, 2009
17 incident that occurred outside Judge James' courtroom following a hearing on a discovery
18 dispute in the <u>Landry</u> case; and fourth, if the answer to any of the above is "yes," whether
19 the court should impose discipline on Mr. Haynes and what that discipline should be.  None
20 of these issues has previously been decided by a judge of this court.

21        The Civil Local Rules require that each member of the bar of this court comply with
22 the standards of professional conduct imposed by the State Bar of California; comply with
23 the Local Rules of the Court; practice with the honesty, care, and decorum required for the
24 fair and efficient administration of justice; and discharge his or her obligations to his or her
25 client and the court.  Civ. L.R. 11-4(a).  The Committee asserts that Mr. Haynes has
26 violated each of these requirements and that, as to some requirements, he has done so
27 repeatedly.  For this misconduct, the Committee has requested that Mr. Haynes be
28 disbarred from practice in the Northern District.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    The evidence is clear and undisputed that Mr. Haynes failed to comply with the

2    standards of conduct imposed by the State Bar of California, in that he failed to perform

3    legal services with competence, as required by Rule of Professional Conduct 3-110, and

4    violated his professional duties towards his clients – in particular, the duties set forth in

5    Rules of Professional Conduct 3-500 and 3-700.

6    With regard to Ms. Cotterill, it is undisputed that he failed to keep her advised of the

7    progress of her case, including the fact that he had failed to file a timely opposition to the

8    motion for summary judgment (necessitating the issuance of an order to show cause), and

9    the fact that the court had granted summary judgment for defendants.  It is also undisputed

10   that he filed a notice of appeal in direct contravention of her written instructions and that he

11   failed to notify her of that fact, and further, that he failed to dismiss the appeal when she

12   asked him to do so.  In addition, it is undisputed that he failed to promptly release the client

13   file to her, despite numerous written requests.  Mr. Haynes has provided no legal

14   justification for his failure to comply with these ethical and professional duties.

15   With regard to the Landrys, it is undisputed that the district court dismissed the case

16   as a sanction for Mr. Haynes' failure to comply with discovery obligations and orders of the

17   court.  It is also undisputed that the Ninth Circuit dismissed the appeal because Mr. Haynes

18   failed to file the opening brief, despite having been granted numerous continuances of the

19   deadlines.

20   The evidence is also clear and undisputed that Mr. Haynes has failed to practice law

21   in the Northern District with the honesty, care, and decorum required for the fair and

22   efficient administration of justice.  See Civ. L.R. 11-4(a)(4).  With regard to Mr. Haynes'

23   behavior towards opposing counsel in the Cotterill case, it is undisputed that he sent

24   e-mails to Mr. Pratt telling him to "read your fucking email" and saying, "Fuck you" and

25   calling him a "lying bitch."  With regard to his behavior in the Gillis case, it is undisputed that

26   he referred to Ms. Osborn during the course of a deposition as a "poor little white girl."

27   With regard to Mr. Haynes' behavior towards opposing counsel in the Landry case,

28   the degree to which Mr. Haynes failed to practice with decorum is underscored by the

1    involvement of the marshals and the FPS officers, who are generally not required to

2    intervene in meet-and-confer sessions between attorneys regarding discovery scheduling.

3         It is undisputed that during the October 8, 2009 incident outside Judge James'

4    courtroom, Mr. Haynes told Mr. Zaheer to "grow the fuck up" and to "shut the fuck up;"

5    called Mr. Zaheer "a little fuckhead;" and said "I should have knocked the shit out of you

6    earlier."  Mr. Haynes does dispute that he called Mr. Zaheer a "little bitch" or a "goddamn

7    bitch," although he conceded that he might have said "goddamn bitch" with reference to the

8    "whole process" because he was "frustrated" by Mr. Zaheer.  However, Ms. Phillimore, the

9    only witness who was not personally involved in the incident, clearly recalled hearing Mr.

10   Haynes call Mr. Zaheer a "bitch" and a "little bitch."  Mr. Larsen also heard Mr. Haynes call

11   Mr. Zaheer a "little bitch."

12        Mr. Haynes also disputes that his actions were abusive or threatening, but the

13   witnesses who appeared at the evidentiary hearing confirmed that Mr. Haynes was yelling,

14   that he walked towards Mr. Zaheer making threatening and abusive remarks, and that he

15   pushed up close to Mr. Zaheer, forcing him to move backwards towards the courtroom

16   doors.  Mr. Zaheer testified that he felt physically threatened, and both Ms. Phillimore and

17   Mr. Larsen testified that they were afraid Mr. Haynes was going to strike Mr. Zaheer,

18   because of Mr. Haynes' actions and his words.  The witnesses also confirmed that Mr.

19   Haynes continued yelling and directing profane language towards the court security officers

20   who arrived after having been summoned by Judge James' courtroom deputy.

21        In short, the court finds that the testimony of all four witnesses was fairly consistent,

22   with Ms. Phillimore being the most persuasive because she was a disinterested witness

23   who had occasion to observe the incident solely by virtue of being present at the

24   courthouse on other business.

25        It is also undisputed that Mr. Haynes failed to comply with his duty not to mislead the

26   judge in the Landry case, in violation of Rule of Professional Conduct 5-200.  In his

27   November 13, 2009 declaration, Mr. Haynes stated that "[t]he allegations of profane name

28   calling is [sic] disproved," that he "did not lose his composure during the events of Oct 8,

1    2009," and that he "did not cause a disturbance."  These statements were false, and

2    designed to mislead the court, as was his overall description of the incident, which

3    downplayed his use of profane and objectionable language and aggressive posturing.

4           Finally, the evidence presented by the Committee shows that Mr. Haynes failed to

5    cooperate and participate in the disciplinary investigation, in violation of California Business

6    & Professions Code § 6068(I), as evidenced by his refusal to meet with members of the

7    Committee to discuss the matters raised in Ms. Hoeper's letter, and his refusal to accept

8    service of the deposition subpoena.

9           The court finds that Mr. Haynes' failure to comply with his ethical and professional

10   duties towards his clients in the <u>Cotterill</u> and <u>Landry</u> matters alone provides sufficient

11   grounds for disbarment.  In addition, however, the undisputed evidence reveals an ongoing

12   pattern of failure to comply with court orders, failure to follow the rules of practice, and

13   professional misconduct involving abusive and antagonistic behavior toward opposing

14   counsel.

15          Indeed, as detailed above, the very history of this proceeding illustrates Mr. Haynes'

16   routine methods of practicing law in federal court.  More than three years have passed

17   since the date in February 2010 when Ms. Hoeper wrote the letter to Chief Judge Walker

18   that prompted the referral to the Committee.  No later than mid-April 2010, Mr. Haynes was

19   on notice of the Committee's investigation.

20          During that three-year period, Mr. Haynes has responded in exactly the opposite

21   way one would expect from an attorney whose conduct is being scrutinized by a peer

22   review committee and the court.  He has refused to cooperate with the Committee at every

23   turn.  Every deadline set by the court has been met with multiple requests for continuances.

24   His written work product is sloppy, bordering on incomprehensible, and replete with

25   typographical and grammatical errors, making it difficult for the court to even understand his

26   arguments.  In short, he has failed to practice competently.

27          Moreover, Mr. Haynes has utterly failed to rehabilitate himself, and has

28   demonstrated, time and again, a pattern of refusing to accept responsibility for his actions.

1    Indeed, he has yet to even acknowledge that he has done anything improper.  Rather, he

2    has been quick to blame opposing counsel, the judges of this court, the Standing

3    Committee, and his own clients for his professional shortcomings.

4           Accordingly, the court finds that suspension from practice and time to reflect on his

5    professional failings would not serve to protect the public, the court, and other attorneys

6    who practice at this court from the deleterious effects of Mr. Haynes' lack of professional

7    responsibility.  The Committee's motion for summary adjudication of disbarment is

8    GRANTED.

9           As per Civil Local Rule 11-7(c)(5), in effect at the time the petition was filed, no later

10   than 14 days after the filing of this order, respondent may petition the Chief Judge of this

11   court for review of this decision by a panel of three judges of this court to be designated by

12   the Chief Judge.

13

14   **IT IS SO ORDERED.**

15   Dated:  March 22, 2013

16                                               _____
                                                 PHYLLIS J. HAMILTON
17                                               United States District Judge

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
For the Northern District of California

# APPENDIX A

**United States District Court**
For the Northern District of California

# 11. ATTORNEYS
# (Effective Through July 1, 2012)

## 11-1. The Bar of this Court

**(a) Members of the Bar.** Except as provided in Civil L.R. 11-2, 11-3 and 11-9, only members of the bar of this Court may practice in this Court. The bar of this Court consists of attorneys of good moral character who are active members in good standing of the bar of this Court prior to the effective date of these local rules and those attorneys who are admitted to membership after the effective date.

**(b) Eligibility for Membership.** After the effective date of these rules an applicant for admission to membership in the bar of this Court must be an attorney who is an active member in good standing of the State Bar of California.

**(c) Procedure for Admission.** Each applicant for admission must present to the Clerk a sworn petition for admission in the form prescribed by the Court. The petition must be accompanied by a certified copy of certificate of membership in the State Bar of California. Prior to admission to the bar of this Court, an attorney must certify:

   **(1)** Knowledge of the contents of the Federal Rules of Civil and Criminal Procedure and Evidence, the Rules of the United States Court of Appeals for the Ninth Circuit and the Local Rules of this Court;

   **(2)** Familiarity with the Alternative Dispute Resolution Programs of this Court; and

   **(3)** Understanding and commitment to abide by the Standards of Professional Conduct of this Court set forth in Civil L.R. 11-4.

**(d) Admission Fees.** Each attorney admitted to practice before this Court under this Local Rule must pay to the Clerk the fee fixed by the Judicial Conference of the United States, together with an assessment in an amount to be set by the Court. The assessment will be placed in the Court Non-Appropriated Fund for library, educational and other appropriate uses.

**(e) Admission.** Upon signing the prescribed oath and paying the prescribed fees, the applicant may be admitted to the bar of the Court by the Clerk or a Judge, upon verification of the applicant's qualifications.

**(f) Certificate of Good Standing.** A member of the bar of this Court, who is in good standing, may obtain a Certificate of Good Standing by presenting a written request to the Clerk and paying the prescribed fee.

## 11-2. Attorneys for the United States

Attorneys employed or retained by the United States government or any of its agencies may practice in this Court in all actions or proceedings within the scope of their employment or retention by the United States.

## 11-3. *Pro Hac Vice*

**(a) Application.** An attorney who is not a member of the bar of this Court may apply to appear *pro hac vice* in a particular action in this district by filing a written application on oath certifying the following:

   **(1)** That he or she is an active member in good standing of the bar of a United States Court or of the highest court of another State or the District of Columbia, specifying such bar;

**(2)** That he or she agrees to abide by the Standards of Professional Conduct set forth in Civil L.R. 11-4, and to become familiar with the Local Rules and Alternative Dispute Resolution Programs of this Court;

**(3)** That an attorney, identified by name, who is a member of the bar of this Court in good standing and who maintains an office within the State of California, is designated as co-counsel.

**(b) Disqualification from pro hac vice appearance.** Unless authorized by an Act of Congress or by an order of the assigned judge, an applicant is not eligible for permission to practice *pro hac vice* if the applicant:

**(1)** Resides in the State of California; or

**(2)** Is regularly engaged in the practice of law in the State of California. This disqualification shall not be applicable if the *pro hac vice* applicant (i) has been a resident of California for less than one year; (ii) has registered with, and completed all required applications for admission to, the State Bar of California; and

**(3)** Has officially registered to take or is awaiting his or her results from the California State Bar exam.

**(c) Approval.** The Clerk shall present the application to the assigned judge for approval. The assigned judge shall have discretion to accept or reject the application.

**(d) Admission Fee.** Each attorney requesting to be admitted to practice under Civil L.R. 11-3 must pay to the Clerk a fee in an amount to be set by the Court. The assessment will be placed in the Court's Non-Appropriated Fund for library, educational, and other appropriate uses. If the Judge rejects the application, the attorney, upon request, shall have the fee refunded.

**(e) Appearances and Service on Local Co-Counsel.** All papers filed by the attorney must indicate appearance *pro hac vice*. Service of papers on and communications with local co-counsel designated pursuant to Civil L.R. 11-3(a)(3) shall constitute notice to the party.

# 11-4. Standards of Professional Conduct

**(a) Duties and Responsibilities.** Every member of the bar of this Court and any attorney permitted to practice in this Court under Civil L.R. 11 must:

**(1)** Be familiar and comply with the standards of professional conduct required of members of the State Bar of California;

**(2)** Comply with the Local Rules of this Court;

**(3)** Maintain respect due to courts of justice and judicial officers;

**(4)** Practice with the honesty, care, and decorum required for the fair and efficient administration of justice;

**(5)** Discharge his or her obligations to his or her client and the Court; and

**(6)** Assist those in need of counsel when requested by the Court.

## Commentary

The California Standards of Professional Conduct are contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and decisions of any court applicable thereto.

**(b) Prohibition Against Bias.** The practice of law before this Court must be free from prejudice and bias. Treatment free of bias must be accorded all other attorneys, litigants, judicial officers, jurors and support personnel. Any violation of this policy should be brought to the attention of the Clerk or any Judge for action under Civ. L.R. 11-6.

69

**(c) Prohibition against *Ex Parte* Communication.** Except as otherwise provided by law, these Local Rules or otherwise ordered by the Court, attorneys or parties to any action must refrain from making telephone calls or writing letters or sending copies of communications between counsel to the assigned Judge or the Judge's law clerks or otherwise communicating with a Judge or the Judge's staff regarding a pending matter, without prior notice to opposing counsel.

**Commentary**

This rule is not intended to prohibit communications with a Courtroom Deputy Clerk regarding scheduling.

# 11-5. Withdrawal from Case

**(a) Order Permitting Withdrawal.** Counsel may not withdraw from an action until relieved by order of Court after written notice has been given reasonably in advance to the client and to all other parties who have appeared in the case.

**(b) Conditional Withdrawal.** When withdrawal by an attorney from an action is not accompanied by simultaneous appearance of substitute counsel or agreement of the party to appear pro se, leave to withdraw may be subject to the condition that papers may continue to be served on counsel for forwarding purposes (or on the Clerk, if the Court so directs), unless and until the client appears by other counsel or pro se. When this condition is imposed, counsel must notify the party of this condition. Any filed consent by the party to counsel's withdrawal under these circumstances must include acknowledgment of this condition.

# 11-6. Discipline

**(a) General.** In the event that a Judge has cause to believe that an attorney has engaged in unprofessional conduct, the Judge may do any or all of the following:

**(1)** Initiate proceedings for civil or criminal contempt under Title 18 of the United States Code and Rule 42 of the Federal Rules of Criminal Procedure;

**(2)** Impose other appropriate sanctions;

**(3)** Refer the matter to the appropriate disciplinary authority of the state or jurisdiction in which the attorney is licensed to practice;

**(4)** Refer the matter to the Court's Standing Committee on Professional Conduct; or

**(5)** Refer the matter to the Chief Judge for her or him to consider whether to issue an order to show cause under Civ. L.R. 11-7.

**(b) "Attorney" Defined.** For purposes of Civil L.R. 11-6, the term "attorney" may include law corporations and partnerships, when the alleged conduct occurs in the course and scope of employment by the corporation or partnership, and includes attorneys admitted to practice in this Court *pro hac vice* pursuant to Civil Local Rule 11-3.

**(c) Standing Committee on Professional Conduct.** The Court will appoint as Special Masters for Disciplinary Proceedings pending before the Court, a Standing Committee on Professional Conduct consisting of seven members of the bar and designate one of the members to serve as Chair of the Committee. The members of the Committee shall continue in office for a period of 4 years. Members shall serve staggered terms, with four of the first appointees serving for 2 years and three members serving for 4 years.

**(d) Discipline Oversight Committee.** The Chief Judge shall appoint three (3) or more Judges to

70

**United States District Court**
For the Northern District of California

a Discipline Oversight Committee which shall oversee the administration of this Local Rule.

# 11-7. Reciprocal Discipline and Discipline Following Felony Conviction

**(a) Notice.** Any attorney admitted to practice in this Court who is convicted of a felony, suspended, disbarred or placed on disciplinary probation by any court, or who resigns from the bar of any court with an investigation into allegations of unprofessional conduct pending, must give notice to the Clerk in writing within 14 days of such event.

**(b) Order to Show Cause.** Unless referred to the Standing Committee on Professional Conduct, matters subject to reciprocal discipline on the grounds listed in paragraph (a) above shall be handled as follows:

**(1)** In such matters, the Chief Judge shall issue an order to the attorney that he or she show cause why the attorney should not be disbarred, suspended, placed on disciplinary probation or otherwise disciplined.

**(2)** If no response is received to an order to show cause within 28 days of mailing, the Chief Judge shall make an independent review of the record of the other proceedings to determine that there was no deprivation of due process, sufficient proof of misconduct, and that no grave injustice would result from the imposition of discipline. The Chief Judge shall issue an appropriate order.

**(3)** An attorney who wishes to contest reciprocal discipline must file with the Court a timely response to the order to show cause. The Chief Judge may then act on the matter, assign it to another judge or refer it to the Standing Committee on Professional Conduct for recommendation.

**(4)** An attorney disbarred, suspended or placed on disciplinary probation under the reciprocal discipline provisions of this rule may seek reinstatement upon completion of the period of suspension, disbarment or disciplinary probation by filing a petition with the Clerk, together with proof of any reinstatement by the reciprocal jurisdiction. An attorney disbarred by reason of a felony conviction may not petition for reinstatement until at least one year after entry of the disbarment order.

**(c) Matters Referred to the Standing Committee.** Unless otherwise directed by the Court, the Standing Committee on Professional Conduct shall investigate any charge or information, referred in writing by a Judge of this Court, that any member of the bar of this Court or any attorney permitted to practice in this Court has engaged in unprofessional conduct in connection with an action in this district, in accordance with the following procedure:

**(1)** Each matter referred shall be assigned an appropriate number by the Clerk, who shall maintain a file under seal. At the written request of the Standing Committee, the Chief Judge (or in a matter referred by the Chief Judge, the General Duty Judge) may direct the issuance of subpoenas and subpoenas ducestecum.

**(2)** Investigations shall be conducted informally as the Standing Committee deems advisable. Investigations shall be confidential unless the Discipline Oversight Committee, upon application by the Standing Committee on Professional Conduct or the attorney, concludes that there is a compelling reason to make the matter public. The Standing Committee may finally resolve any referred matter informally, short of formal discipline, as it deems appropriate, and must provide a report of its investigation and any resolution to the referring judge. Records shall be maintained as directed by the Discipline Oversight Committee.

**(3)** All final actions of the Standing Committee require a majority vote. However, the

**United States District Court**
For the Northern District of California

Standing Committee may organize itself and conduct its affairs by subcommittees of one or more members as it deems advisable. If a majority of the members determine that public reprimand, suspension, disbarment, or other formal discipline is warranted, and the respondent attorney does not consent, the Standing Committee shall institute a disciplinary proceeding by filing with the Clerk a sealed petition that identifies specifically the alleged misconduct. Upon the filing of the petition, the proceeding shall be assigned to a Judge, other than the referring Judge, in the same manner as any other civil action or proceeding. Unless otherwise directed by the assigned judge, the proceeding shall then be presented by a member of the Standing Committee. The presenting attorney will be paid out-of-pocket expenses from court funds.

**(4)** The Judge to whom the proceeding is assigned shall issue an order to show cause setting a date for hearing, addressed to the respondent attorney, requiring the attorney to appear and show cause why he or she should not be disciplined as prayed for in the petition. The order shall direct that a copy thereof, together with a copy of the petition, be served on the respondent in a manner permitted by Fed. R. Civ. P. 5(b) not less than 35 days in advance of the date specified for hearing. Any response must be filed at least 21 days in advance of the date specified for hearing. Thereafter, the matter shall proceed in accordance with the Federal Rules of Civil Procedure and this Court's Civil Rules as to discovery, motion practice, pretrial and trial as in other civil actions. Written findings of fact and an order based thereon shall be filed by the Judge when dismissing the proceeding or when imposing discipline.

**(5)** Except with respect to reciprocal discipline pursuant to subparagraph (a) of this Local Rule, any order of disbarment or suspension from practice for more than one year shall be reviewable by a panel of three Judges of this Court designated by the Chief Judge, upon petition filed by the respondent within 14 days of filing of the order. Discipline is not stayed during such a review, absent contrary order from the panel or the ordering judge. Review by any such panel shall be de novo as to matters of law and under the substantial evidence standard as to matters of fact. This provision does not apply to revocation of permission to practice *pro hac vice*.

**(6)** The Clerk shall give prompt notice of any order of discipline imposed pursuant to this Local Rule to the disciplinary body of the court(s) before which the respondent attorney has been admitted to practice.

**(d) Costs.** Any discipline or other resolution imposed under this Local Rule may include an order that the respondent attorney pay costs of prosecution, including out-of-pocket expenses of the presenting attorney.

**Cross Reference**

See Fed. R. Civ. P. 11(c), 16(f), 37.

# 11-8. Sanctions for Unauthorized Practice

A person who exercises, or pretends to be entitled to exercise, any of the privileges of membership in the bar of this Court, when that person is not entitled to avail themselves of such membership privileges, shall be subject to sanctions or other punishment, including a finding of contempt.

# 11-9. Student Practice

**(a) Permission to Appear.** With the approval of the assigned Judge, a certified law student who complies with these Local Rules and acts under the supervision of a member of the bar of this Court may engage in the permitted activities set forth in this Local Rule.

**(b) Permitted Activities.** With respect to a matter pending before this Court, a certified law student may:

  **(1)** Negotiate for and on behalf of the client or appear at Alternative Dispute Resolution (ADR) proceedings, provided that the activity is conducted under the general supervision of a supervising attorney;

  **(2)** Appear on behalf of a client in the trial of a misdemeanor or petty offense, provided the appearance is under the general supervision of a supervising attorney who is immediately available to attend the proceeding if the Judge decides to require the presence of the supervising attorney and, if the client is a criminal defendant, the client has filed a consent with the Court; and

  **(3)** Appear on behalf of a client in any other proceeding or public trial, provided the appearance is under the direct and immediate supervision of a supervising attorney, who is present during the proceedings.

**(c) Requirements for Eligibility.** To be eligible to engage in the permitted activities, a law student must submit to the Clerk:

  **(1)** An application for certification on a form established for that purpose by the Court. The Clerk is authorized to issue a certificate of eligibility;

  **(2)** A copy of a Notice of Student Certification or Recertification from the State Bar of California, or a certificate from the registrar or dean of a law school accredited by the American Bar Association or the State Bar of California that the law student has completed at least one-third of the graduation requirements and is continuing study at the law school, (or, if a recent graduate of the law school, that the applicant has registered to take or is awaiting results of the California State Bar Examination). The certification may be withdrawn at any time by the registrar or dean by providing notice to that effect to the Court; and

  **(3)** Certification from a member of the bar of this Court that he or she will serve as a supervising attorney for the law student. The certification may be withdrawn at any time by a supervising attorney by providing notice to that effect to the Court.

**(d) Requirements of Supervising Attorney.** A supervising attorney must:

  **(1)** Be admitted or otherwise permitted to practice before this Court;

  **(2)** Sign all documents to be filed by the student with the Court;

  **(3)** Assume professional responsibility for the student's work in matters before the Court; and

  **(4)** Assist and counsel the student in the preparation of the student's work in matters before the Court.

**(e) Termination of Privilege.** The privilege of a law student to appear before this Court under this rule may be terminated by the Court at any time in the discretion of the Court, without the necessity to show cause.